PORTO RICO RAILWAY, LIGHT & POWER COMPANY, demandante, apelante y apelada, *v.* RAFAEL A. BUSCAGLIA, TESORERO DE PUERTO RICO, demandado, apelado y apelante.

Núm. 8664.—*Sometido:* Julio 6, 1943. *Resuelto:* Noviembre 22, 1943.

*Brown, González & Newsom,* abogados de la apelante apelada; *Hon. Procurador General Interino M. Rodríguez Ramos* y *Carmen B. Hernández, Oficial Jurídico,* abogados del apelado apelante.

El Juez Asociado Señor Snyder emitió la opinión del tribunal.

Este es un caso en el que ambas partes han apelado de diversas porciones de la sentencia dictada por la corte de distrito en un pleito sobre devolución de $59,216.41 pagados bajo protesta como resultado de deficiencias tasadas por concepto de contribuciones sobre ingresos.

I

 La primera causa de acción en el pleito del contribuyente se refería a su planilla para el año 1929. La Porto Rico Railway, Light & Power Co. en sus planillas para los años 1928 y 1929 reclamaba ciertas rebajas sustanciales por concepto de pérdidas ocasionadas por el huracán de 1928. En 1932 el Tesorero rechazó estas rebajas en una parte sustancial y determinó tasaciones de deficiencias por tal concepto. Hubo varios procedimientos ante el Tesorero y ante la Junta de Revisión e Igualamiento que no es necesario detallar aquí, excepto para manifestar que por el año 1936, mediante actuaciones del Tesorero y de la Junta, se admitió finalmente que las contenciones de la Compañía eran correctas substancialmente (se alegaba que las pérdidas ocasionadas por el huracán del 1928 ascendían a $375,048.05; la cantidad acordada en definitiva fué $374,921.90).

Sin embargo, en vez de hacer los reembolsos correspondientes, el Tesorero el 4 de marzo de 1937—siete años y diez meses después de radicarse la planilla de 1928, y seis años diez meses después de radicarse la de 1929—notificó a la Compañía una nueva deficiencia para el 1929 de aproximadamente $10,000 con intereses. Esta deficiencia se fundaba en la negativa del Tesorero de conceder a la Compañía que rebajara de su ingreso bruto las sumas de $39,319.90 y $38,643.60 pagadas por la Compañía en 1928 y 1929, respectivamente, a la Montreal Engineering Company como cargos de administración (*management fees*) de conformidad con un contrato a tal fin.

La compañía alega que esta nueva deficiencia había prescrito. La sección 60(*a*)(1) de la Ley de Contribuciones sobre Ingresos dispone que las contribuciones sobre ingresos "se tasarán dentro de cinco años después de radicarse la declaración. . ." (Leyes de Puerto Rico de 1925, pág. 521). Si no estuvieran envueltas otras disposiciones de ley, las deficiencias en este caso, determinadas en 1936 para una pla-

nilla del 1929, estarían, desde luego, prescritas. Sin embargo, alega el Tesorero, y la corte de distrito así lo resolvió, que el término prescriptivo estuvo. suspendido en este caso durante aproximadamente tres años, el tiempo en que la apelación de la Compañía estuvo pendiente ante la Junta de Revisión e. Igualamiento.

El Tesorero alega que este período ha sido adicionado debidamente al término prescriptivo ordinario a virtud de la sección 60(*b*) de la Ley de Contribuciones sobre Ingresos (Leyes de Puerto Rico, 1925, pág. 523), que lee como sigue:

"El período durante el cual la subdivisión (*a*) de esta sección requiere que se verifique una tasación de cualquier deficiencia, será prorrogado (1) treinta días si al contribuyente le hubiere sido notificado por correo de acuerdo con la subdivisión (*a*) de la sección 57 y no hubiere radicado apelación alguna ante la Junta de Revisión e Igualamiento, o (2) *si se hubiere radicado alguna apelación, entonces por el número de días entre la fecha del envío por correo de dicha notificación y la fecha de la decisión final de la Junta.*" (Bastardillas nuestras).

La posición del Tesorero es que la apelación interpuesta por la Compañía para ante la Junta de Revisión e Igualamiento en relación con la deficiencia que denegaba las pérdidas ocasionadas por el huracán interrumpió el término prescriptivo, de conformidad con la sección 60(*b*), en cuanto a la planilla de 1929 *en su totalidad,* dándole la oportunidad al Tesorero de tasar una deficiencia adicional, basada en una partida de ingresos no relacionada enteramente, después de transcurrido el período estatutario de cinco años, pero dentro de los cinco años más el período durante el cual estuvo pendiente la apelación sobre la deficiencia original.

Consideramos el caso de *Commissioner of Internal Revenue* v. *Wilson,* 60 F. (2) 501 (C. C. A., 10mo. Circ., 1932), como aplicable y decisivo de la cuestión ante nos. En dicho caso, poco antes de transcurrir el período prescriptivo, el Comisionado determinó una deficiencia, la cual el contribuyente pagó sin solicitar una redeterminación de la Junta de

Apelación de Contribuciones. Más tarde el Comisionado envió al contribuyente una notificación de nueva deficiencia, referente a la contribución para el mismo año, pero, en ninguna otra manera relacionada con la deficiencia original. Se admitió que esta deficiencia estaba prescrita por el estatuto, a no ser que la notificación de la primera deficiencia hubiera suspendido el estatuto.

La Corte de Circuito de Apelaciones convino con el contribuyente en que (pág. 502) "se suspende el estatuto únicamente a los fines de darle la oportunidad al Comisionado de tasar y cobrar la deficiencia específica comprendida en la notificación, el envío de la cual es una condición para que el estatuto se suspenda." La corte resolvió que no habiéndose interpuesto apelación en relación con la deficiencia original, el término prescriptivo no se había suspendido con fin alguno, y que por tanto estaba prescrita la reclamación sobre la nueva deficiencia. Al discutir el propósito de la sección 272($a$) (anteriormente la sección 274) de la Ley Federal, la corte dijo a las páginas 503, 4:

"Manifiestamente el período durante el cual el Comisionado no puede tasar no debe contársele en contra. Manifiestamente asimismo, debe concedérsele un período razonable para tasar después que puede libremente actuar. El propósito general, por tanto, de la subdivisión es indemnizar al Comisionado por el tiempo que se le quitó de sus cuatro años; hacer la limitación de cuatro años uniforme en su aplicación; . . . El Comité de Conferencias hábilmente describe la subdivisión como que suspende el estatuto 'por el período durante el cual, por cualquier razón, el Comisionado tiene las manos atadas, y además le asegura un período de por lo menos 60 días después que esté en condiciones de actuar para hacer la tasación o iniciar el procedimiento para el cobro.'

"Resta sólo la pregunta, ¿estaba el Comisionado en condiciones de iniciar los procedimientos para cobrar la partida de $2,969.76 en cualquier tiempo durante el período estatutario de cuatro años? Si lo estaba, no hay razón alguna para que se deba prorrogar dicho período. Si se le prohibía actuar en cuanto a esta partida después de su notificación de deficiencia de $251.06, enviada el 9 de marzo, entonces debía suspenderse el estatuto hasta 60 días después que él

estuviera en condiciones de actuar. Sobre esta cuestión las partes están contestes; ambas convienen en que la notificación del 9 de marzo no limitó su poder para actuar en cuanto a la contribución aquí envuelta. El Comisionado no agota su poder para determinar, dentro del período estatutario, la contribución legalmente adeudada, cuando envía una notificación de parte de la deficiencia. Tiene el poder, dentro del período prescriptivo, de hacer tantas nuevas investigaciones, redeterminaciones y retasaciones cuantas puedan ser necesarias para cobrar toda la deficiencia. *Holmquist* v. *Blair* (C. C. A., 8vo. Circ.) 35 F. (2d) 10. El estatuto no prohibe la determinación de deficiencias adicionales debido al hecho de que exista una notificación en cuanto a una deficiencia por el mismo año. Al contrario, la historia legislativa destaca con entera claridad el hecho de que fué la intención del Congreso que el Comisionado tuviera tal poder. La sección 274(f), tal como fué aprobada en la Cámara, disponía que después que el Comisionado hubiera notificado la deficiencia al contribuyente, no tendría derecho a determinar una deficiencia adicional por el mismo año contributivo, excepto bajo circunstancias que no concurren aquí. El Senado adoptó la recomendación del Comité de Finanzas 'que esta disposición se aplique sólo a los casos en que el contribuyente ha apelado para ante la Junta'. La Cámara concurrió. H. R. Rept. núm. 356, Congreso 69 1ra. Sesión, págs. 39, 40. Esta sección, sección 274(f) de la ley (26 USCA § 1048d), lee en la actualidad: 'Si después de aprobarse esta ley el Comisionado ha enviado al contribuyente una notificación de deficiencia, tal como se dispone en la subdivisión (a), y el contribuyente radica una petición ante la Junta dentro del término dispuesto en tal subdivisión, el Comisionado no tendrá derecho a determinar deficiencia adicional alguna en relación con el mismo año contributivo, excepto en caso de fraude y excepto como se dispone en la subdivisión (e) de esta sección o en la subdivisión (c) de la sección 279.'

"En el caso de que se radique una petición ante la Junta, a ésta se le confiere jurisdicción para aumentar la deficiencia impuesta por el Comisionado, y para determinar que deben imponerse contribución adicional o penalidades si el Comisionado hace tal reclamación antes de la vista. Sección 274(e) de la ley (26 USCA, § 1048c). Leyendo estos estatutos conjuntamente, encontramos un sistema lógico sin mezclarlos: la autoridad del Comisionado para redeterminar una deficiencia es absoluta hasta que el contribuyente radica una petición ante la Junta; desde ese momento en adelante el poder para actuar sobre dicho año contributivo descansa exclusivamente en la Junta,

excepto cuando es necesaria una imposición de emergencia (*jeopardy assessment*) o en caso de fraude.

"Por tanto, es inevitable la conclusión de que el Comisionado podía durante todo el período prescriptivo de cuatro años iniciar gestiones para cobrar la contribución aquí envuelta. Sólo se suspende el estatuto 'por el período durante el cual el Comisionado está impedido de hacer la imposición', y por los 60 días siguientes. No existió tal período en cuanto a esta contribución."

Puede verse que la regla de derecho aquí envuelta es sencilla. Se suspende el término prescriptivo mientras el Comisionado—en nuestro caso el Tesorero—tiene las manos atadas. El caso de *Wilson* indica que si no se establece una apelación, bajo la Ley Federal el Comisionado está en libertad para determinar deficiencias adicionales dentro del período estatutario original. En su consecuencia, la primera notificación de deficiencia no interrumpe el término prescriptivo. De la misma manera, bajo nuestro estatuto, aun en caso de una apelación, el Tesorero está en libertad para determinar deficiencias adicionales; y, por tanto, no podemos evitar el concluir que en esta jurisdicción el estatuto se suspende solamente en cuanto a la deficiencia de la cual se apela, y no en cuanto a una deficiencia nueva y no relacionada que pueda el Tesorero determinar, mucho después de haber expirado el período prescriptivo, pero mientras está aún pendiente la apelación sobre la deficiencia original.

Nuestra Legislatura nunca ha incorporado en nuestra Ley de Contribuciones sobre Ingresos una disposición similar a la de la Ley Federal, por la que se le prohibe al Comisionado imponer deficiencias adicionales si el contribuyente apela de la deficiencia original. Como dice correctamente la corte de distrito, el Tesorero puede en todo momento, dentro del período prescriptivo, determinar deficiencias adicionales, aún durante la apelación de una deficiencia original. Este poder o derecho—quizá debiéramos decir deber—del Tesorero de determinar deficiencias adicionales aún cuando esté pendiente la apelación sobre la deficiencia origi-

nal, es la verdadera razón por la cual se suspende el estatuto mediante tal apelación solamente para las deficiencias originales o relacionadas con éstas, y no para deficiencias no relacionadas enteramente, determinadas por el Tesorero después de expirado el período estatutario ordinario.

El Procurador General reconoce la fuerza de este argumento. En su alegato, representando al Tesorero, dice, refiriéndose al caso de *Wilson:*

"Estamos conformes con la decisión de la Corte en dicho caso en el sentido de que la mera notificación de una deficiencia no debe extender el estatuto por un período de 120 días para todos los efectos, porque si lo anterior fuera cierto, el estatuto podría ser prorrogado indefinidamente por notificaciones subsiguientes de otras partes de la deficiencia. La Corte se basó al decidir lo anterior en el hecho de que el Comisionado no estaba en modo alguno impedido durante dicho período de 120 días para notificar otras deficiencias."

Dice a continuación el Procurador General, refiriéndose a la Ley Federal, que "de haber recurrido el contribuyente al 'Board of Tax Appeals' el Comisionado no habría podido determinar deficiencia adicional alguna para el mismo año excepto en caso de fraude o cuando un 'jeopardy assessment' fuere necesario." Pero hace caso omiso completamente del hecho de que bajo nuestro estatuto, igual que bajo la Ley Federal de 1924 antes de la enmienda de 1926, el Tesorero no está impedido de imponer deficiencias adicionales a causa de la apelación sobre una deficiencia original. Por tanto, repetimos que no estando atadas las manos del Tesorero a causa de la apelación, en esta jurisdicción no hay lugar a la contención de que la apelación de una deficiencia original suspende el estatuto para deficiencias posteriores no relacionadas.

Nada hallamos en contrario en el caso de *Von Weise* v. *Commissioner of Internal Revenue,* 69 F. (2) 439 (C. C. A., 8vo Circ., 1934), citado por la corte inferior y sobre el cual descansa el Tesorero en el caso de autos. En dicho caso el contribuyente, al radicar su apelación ante la Junta de Ape-

lación de Contribuciones, admitió que parte de la deficiencia, tal como fué impuesta por el Comisionado, era correcta. Por tanto, su posición fué que había renunciado, en cuanto a la parte de la deficiencia que admitió en su petición, las restricciones sobre la imposición y cobro de aquella parte de la deficiencia; y que, en su consecuencia, el estatuto no había sido suspendido durante la pendencia de su apelación en cuanto a la porción de la deficiencia que había admitido.

La Corte de Circuito de Apelaciones rechazó esta contención, resolviendo en efecto que toda vez que el contribuyente había establecido una apelación en cuanto a la deficiencia impuesta, las manos del Comisionado estaban atadas en cuanto a la imposición y cobro de toda la cantidad de la deficiencia y que, por tanto, el estatuto en cuanto a la deficiencia en total había sido suspendido durante la apelación. No podemos ver cómo esta decisión pueda ayudar al Tesorero en este caso. En el caso de *Von Weise* estaba envuelta una sola deficiencia, rehusando la corte que el contribuyente la dividiera y la tratara por partes (*piecemeal*) para sus propios fines. En verdad esto es todo lo que se quiso decir en la manifestación que hallamos en 5 Paul y Mertens, Law of Federal Income Taxation, sección 50.70, pág. 579, al efecto de que "cuando se establece una apelación, sin embargo, la extensión del estatuto se aplica a toda la deficiencia."[1] Nuestra situación es enteramente diferente. En este caso no se trata solamente de una deficiencia única de la que se apela. Tenemos una deficiencia y una apelación de la misma; y entonces, después que el estatuto la hubiera de otro modo prescrito, es más, después que el contribuyente había triunfado en su contención en cuanto a la deficiencia original, una alegación del Tesorero de que la primera deficiencia suspendió el estatuto en lo que respecta a una deficiencia adicional no relacionada enteramente. Bajo tales circunstancias, creemos

---

[1] Esto surge aún más claro si se examina el caso de *Sooy* v. *Commissioner of Internal Revenue*, 40 F. (2) 634 (C. C. A., 9no Circ., 1930), citado por Paul y Mertens para sostener su manifestación.

de aplicación la doctrina del caso de *Wilson* en vez de la del de *Von Weise.*

El caso de *Parish-Watson Co.* v. *Anderson,* 34 F. (2) 322 (Dist. Ct., S.D.N.Y., 1929), el único otro citado por la corte de distrito para sostener su decisión sobre este punto, es completamente inaplicable. Dicho caso sólo envolvía la cuestión de si la renuncia o convenio del contribuyente por un período limitado en cuanto a la contribución que se alegaba debía pagar bajo una ley anterior podía ser luego extendido mediante una ley aprobada después de la fecha del convenio. Nada hay en el lenguaje o decisión de dicho caso que tenga relación alguna con el problema ante nos.

Como se ha indicado antes, bajo la Ley Federal el Comisionado pierde la jurisdicción para determinar deficiencias adicionales tan pronto el contribuyente apela de la deficiencia original. Quizá también deba indicarse que el caso de *Wilson* vierte dudas sobre la proposición de que el Comisionado puede, bajo tales circunstancias, presentar aun ante la Junta una deficiencia no relacionada enteramente que de otro modo estaba prescrita por el estatuto. Sin embargo, sea ello como fuere, apuntamos una vez más que las partes y la corte de distrito convienen en que, de modo diferente al Comisionado Federal, el Tesorero no está impedido bajo nuestra ley de imponer deficiencias adicionales aun cuando esté pendiente la apelación de una deficiencia. Mertens señala esto cuando indica que ''bajo la ley de 1926 el Comisionado no podía determinar deficiencias adicionales después de entablarse una apelación para ante la Junta (tal como lo podía hacer bajo la ley de 1924), pero se le dió la oportunidad de presentar deficiencias adicionales ante la Junta, la que tenía amplia jurisdicción para determinar la cantidad correcta de la deuda contributiva para el año contributivo en cuestión. . . . '' (9 Mertens, Law of Federal Income Taxation, §49.09, pág. 12).[2]

---

[2] Debe tenerse en cuenta que nuestra ley fué copiada de la Ley Federal de 1924 y no ha sido enmendada a este respecto.

Para exponer brevemente el problema, el propósito de la disposición estatutaria aquí envuelta fué suspender el período prescriptivo durante el tiempo en que el Tesorero tuviera las manos atadas (Seidman's Legislative History of Federal Income Tax Laws, págs. 552, 630, 763). Toda vez que bajo nuestra Ley de Contribuciones sobre Ingresos la apelación contra una deficiencia no impide al Tesorero determinar deficiencias adicionales no relacionadas, tal apelación no suspende el estatuto con el fin de determinar tales deficiencias adicionales no relacionadas.

Por tanto, resolvemos que la deficiencia de aproximadamente $10,000 en relación con los cargos de administración (*management fees*) pagados por la Compañía en 1928 y 1929 habían prescrito en el 1936, fecha en que fuera determinada por el Tesorero.[3] Por tanto, la corte de distrito cometió error al dictar sentencia en favor del Tesorero en la primera causa de acción.

## II

Examinaremos a continuación en sus méritos la sentencia de la corte de distrito sosteniendo la actuación del Tesorero al reducir a $5,000 anuales las deducciones por los cargos de administración pagados de conformidad con un contrato a tal efecto, como sigue:

| | |
|---|---|
| 1931 | $41,989.21 |
| 1932 | 34,205.29 |
| 1933 | 35,057.87 |
| 1934 | 39,038.44 |

La corte de distrito resolvió que los cargos de administración propiamente dichos eran gastos ordinarios y necesarios deducibles del ingreso sujeto a tributación de acuerdo con la sección 32(*a*)(1) de la Ley de Contribuciones sobre

---

(3) Escasamente tenemos que añadir que bajo la Sección 61(*a*) de la Ley de Contribuciones sobre Ingresos, no hay limitación en cuanto a tasación y cobro de una contribución en caso de fraude.

Ingresos. Sin embargo, la corte de distrito resolvió que la evidencia ofrecídale no la había puesto "en condiciones de resolver si el Tesorero de Puerto Rico actuó arbitrariamente al fijar como una compensación razonable por 'management fees' la cantidad de $5,000 para cada uno de los años en discusión, y por tanto es nuestro deber aceptar que dicha suma es una compensación razonable, por cuanto la prueba de la demandante no ha sido suficiente para destruir la presunción de corrección de la actuación y determinación hecha por el Tesorero."

Pasamos por tanto a examinar la prueba de la Compañía sobre este punto. Examinaremos este testimonio, tal como sugieren los abogados, a la luz de algunas de las fórmulas establecidas en 3 Paul y Mertens, supra, §§23.81–23.115, págs. 76–104 (a ese mismo fin, 4 Mertens, supra, §§25.44–25.67, págs. 395–432).

Para determinar la razonabilidad de tal compensación, es significativa la proporción del pago en relación con el ingreso bruto. En el presente caso el cargo de administración pagado a la Montreal Engineering Company representaba 2½ por ciento del ingreso bruto, y con excepción de los dos años en que ocurrieron huracanes, la Compañía pagó desde 1928 al 1934 dividendos de 8½ por ciento al 14 por ciento sobre su capital invertido. Por tanto, parece que los cargos de administración no estuvieron en desproporción en relación con el ingreso.

Paul y Mertens también indican que sueldos u otra compensación por servicios deben guardar una relación razonable con el volumen del negocio envuelto. Tenemos aquí una compañía que suministra luz y energía eléctrica a medio Puerto Rico y a la mitad de sus habitantes, con un valor en sus libros que fluctúa durante los años en cuestión entre diez y doce millones de dólares, con un ingreso bruto de aproximadamente $1,500,000 al año. A este respecto, la prueba de la Compañía fué que el personal empleado por ella consistía

exclusivamente de operarios, y que sería necesario aumentar su nómina en $75,000 ó $100,000 anuales si la propia Compañía se hiciera cargo de las gestiones realizadas ahora por la Montreal Engineering Company. Bajo estas circunstancias, los cargos de administración, cuyo promedio era menos de $40,000 al año, no parecen carecer de una relación razonable en cuanto al volumen del negocio de la Compañía.

La prueba de la Compañía fué también al efecto de que la Montreal Engineering Company presta servicios de supervisión y de ingeniería a once compañías de servicio público en Centro y Sur América, Puerto Rico y Canadá, y que mantiene una organización de 35 a 60 personas consistente en ocho departamentos, que incluyen contabilidad, ingeniería, tarifa y tasación, y compras. Estos departamentos están todos constituídos por personas que son especialistas y que están íntimamente relacionadas con los negocios de las compañías que supervisan. La prueba fué al efecto de que el contrato en cuestión fué de mucho valor especialmente después de los huracanes de 1928 y 1932, cuando la Compañía recibió innumerables servicios expuestos en detalle en el récord, en relación con las compras, reconstrucción y otras gestiones necesarias para el restablecimiento del negocio de la Compañía de suministrar energía en Puerto Rico. De la misma manera, la Montreal Engineering Company suministró a la Compañía el personal técnico que se necesitó para un largo caso de tarifas ventilado ante la Comisión de Servicio Público y ante las cortes en el 1934.

De conformidad con la prueba, Montreal Engineering Company mantiene oficinas en Montreal, Nueva York y Londres para fines de compras. Debido a sus contactos con los manufactureros y su sistema central de compras para las once compañías a quienes les da servicio, ha efectuado grandes economías en la compra de materiales. En la prueba de la Compañía se estimó que estas economías representan diez por ciento del precio total de las compras hechas desde el

1928 al 1934 ascendente aproximadamente de $8,500 a $12,000 anuales. Uno de los ejemplos suministrados fué el ahorro de $10,500 por la Compañía en la compra de aceite solamente en 1934. La prueba fué que el ahorro de la Compañía como resultado de tales compras fué 49 por ciento de todos los cargos de administración pagados durante los años envueltos. Es difícil ver de qué manera el Tesorero pudo resolver razonablemente que sólo la cantidad de $5,000 anuales como cargo de administración estaba justificada, cuando no realizó esfuerzo alguno para contradecir el testimonio de la Compañía al efecto de que el contrato de administración le había ahorrado $20,000 al año sólo en la compra de materiales.

La Montreal Engineering Company realizó todas las negociaciones y el expedienteo necesario para la compra de materiales, procedentes todos de fuera de Puerto Rico. La Compañía por tanto indica que, además de las economías en el precio de venta de. los materiales, se ha economizado el gasto de mantener un agente de compras y una oficina u oficinas fuera de Puerto Rico para tal fin.

También la prueba fué al efecto de que la Montreal Engineering Company estaba constantemente dedicada al estudio de tarifas mediante sus expertos en tarifas, y le suministró a la Compañía sus consejos en problemas obreros, de gran valor debido a su experiencia con otras compañías.

Una de las fórmulas usadas por Paul y Mertens es la comparación con la compensación pagada por otras compañías por servicios similares. La Compañía no ofreció tal prueba. Los abogados de la Compañía afirman en este caso que no existe situación similar en Puerto Rico. Sin embargo, se ofreció prueba de que, aunque la Montreal Engineering Company no llevaba un sistema de contabilidad de costo para los años en cuestión, se estableció tal sistema más luego, y que para los años 1936, 1937 y 1938 los costos de la Montreal Engineering Company propiamente asignables a la Compañía fueron aproximadamente de $38,000 anuales,

mientras que los cargos para tales años por servicios substancialmente idénticos a aquellos por los que se pagó en los años en cuestión fueron aproximadamente de $39,000 al año. De acuerdo con tales cifras, no parece que la Montreal Engineering Company realizara una ganancia exagerada en el contrato de administración.

Otra de las fórmulas es el determinar si la compensación guarda estrecha relación con el dominio de acciones. No hubo prueba de que la Montreal Engineering Company fuera dueña de acciones de la Compañía o aún, como resolvió la corte de distrito, "que los directores de la Montreal Engineering Company eran también los directores de la demandante". La corte de distrito pudo haber sido inducida a error sobre este último punto debido a que uno de los testigos declaró que era director tanto de la Compañía como de la Montreal Engineering Company. Pero no hubo prueba de la total identidad de los directores de ambas compañías.

Con respecto a la cuestión de razonabilidad también se toma en consideración la compensación pagada en años anteriores por servicios similares. En este caso el Tesorero nunca impugnó cargos de administración similares pagados desde el 1919 al 1927 y en 1930. Durante todos estos años se computó el pago sobre la misma base; es decir, 2½ por ciento del ingreso bruto de la Compañía.

Los casos y los textos antes mencionados también indican que si la fecha en que se fija la compensación es anterior al comienzo del período durante el cual se va a rendir el servicio y en su consecuencia antes de que se puedan conocer las ganancias, esto es un factor que indica que la compensación es razonable. Los hechos en este caso son altamente concluyentes en cuanto a este punto. En este caso, no solamente se fijó la compensación antes de comenzar a rendirse los servicios, si que el primer contrato se otorgó en 1911, cuando la Ley de Contribuciones sobre Ingresos no se había todavía aprobado. Por tanto, es difícil ver de qué manera

se pudo alegar que bajo tales circunstancias el propósito de este contrato de administración era la distribución de ganancias bajo el pretexto de pago por servicios, con el fin de evitar el pago de contribuciones sobre ingresos.

Otro factor para determinar la razonabilidad de tal compensación, es si los directores intervinieron en el contrato. En el presente caso la prueba fué de que la compensación envuelta había sido pagada a virtud de contratos aprobados por los directores.

Finalmente, no puede negarse que las corporaciones íntimas (*close corporations*) frecuentemente se prestan a la distribución de ganancias so pretexto del pago de sueldos. Sin embargo, aún asumiendo que por medios que no es necesario especificar aquí, la Montreal Engineering Company controló, o por lo menos tuvo una importante intervención en, los negocios de la Compañía, "No debe inferirse la conclusión de que los salarios no son razonables *ipso facto* porque se pagaron por una corporación íntima o de familia. La inferencia es más bien que en estos casos el contribuyente pudo confrontarse con el problema de ofrecer una prueba más robusta de razonabilidad que en otras situaciones." (3 Paul y Mertens, supra, §23.111, pág. 101). Véase también *Sobrinos de Izquierdo, Inc.* v. *Sancho Bonet, Tes.*, 56 D.P.R. 182; *Heywood Boot & Shoe Co.* v. *Commissioner of Internal Rev.*, 76 F. (2) 586 (C.C.A., 1er Circ., 1935).

La corte inferior resolvió que la prueba presentada no fué suficientemente detallada y que toda vez que el contribuyente no había cumplido con el peso de la prueba de demostrar que la compensación pagada era razonable, la presunción de que el Tesorero como un funcionario público había actuado correctamente debía prevalecer. Es difícil ver, a la luz de lo que se ha dicho anteriormente, de qué manera la Compañía pudo haber presentado más detalles para justificar los cargos de administración envueltos, a menos que se hubieran revisado todos los pasos dados por la Compañía durante los varios años envueltos. Tal como se hizo, el ré-

cord es excesivamente voluminoso, y como se ha indicado, "En relación con la prueba de cantidades gastadas nunca es posible hacer demasiado hincapié sobre la conveniencia e importancia de una regla liberal. Es cierto que la sabia administración de leyes contributivas requiere que el contribuyente lleve el peso de la prueba. Al mismo tiempo, tanto la Junta como las cortes deben reconocer que deducciones de gastos no son sucesos aislados y poco frecuentes. Exigir al contribuyente que someta el mismo grado de prueba en relación con gastos diarios tal como se requiere en una transacción poco corriente, es hacer caso omiso de las consideraciones prácticas e imponerle una regla demasiado onerosa . . ." (3 Paul y Mertens, supra, §23.168, pág. 155); Véase *Cohan* v. *Commissioner of Internal Revenue*, 39 F. (2) 540, 543-4 (C.C.A., 2do Circ., 1930); *Rugel* v. *Commissioner of Internal Revenue*, 127 F. (2) 393 (C.C.A., 8vo Circ., 1942).

En contraste con los esfuerzos de la Compañía para demostrar la razonabilidad de la compensación envuelta, el Tesorero no ofreció prueba alguna. La corte inferior por tanto sólo tuvo ante sí la evidencia no impugnada de la Compañía. Creemos que la Compañía cumplió con el peso de la prueba al demostrar que la compensación que su contrato le exigía pagar a la Montreal Engineering Company como cargos de administración era razonable dentro de los propósitos de la sección 31(a)(1) de la Ley de Contribuciones sobre Ingresos. Damos énfasis al hecho de que nada de lo que hemos dicho menoscaba el derecho de la Comisión de Servicio Público de examinar la situación en éste o en cualquiera otro caso y determinar si, como una cuestión de reglamentación de servicio público, tal cargo de administración es procedente. En verdad, un número de los casos citados por el Tesorero envuelve exactamente tales situaciones. Pero no podemos concluir que era propio llegar a este resultado, por lo menos en este caso, por medio de un pleito de contribuciones sobre ingresos. Resolvemos por tanto que en el presente

caso la corte de distrito cometió error al sostener la actuación del Tesorero al reducir los cargos de administración para los años 1931, 1932, 1933 y 1934 de la cifra contenida en el contrato a la cantidad de $5,000.

### III

Nuestro tercer problema en este caso se refiere a las planillas para 1931–34. Durante dichos años la Compañía pagó a su Presidente un sueldo anual de $10,000 y en su planilla rebajó aproximadamente $9,000 de dicha cantidad como gastos necesarios incurridos en la operación de su negocio. El Tesorero rechazó estas deducciones por el fundamento de que no eran razonables. La corte inferior resolvió que la cantidad envuelta era compensación razonable por los servicios rendidos y sostuvo por tanto las deducciones para 1933 y 1934. Sin embargo, la corte inferior, por razones que se indicarán más adelante, sostuvo al Tesorero al rechazar éste las rebajas para 1931 y 1932. Ambas partes apelaron de la parte de la sentencia contraria a sus pretensiones

Las leyes federales, desde 1918, al referirse a las deducciones del ingreso sujeto a tributación, han tenido una disposición específica de que gastos "ordinarios y necesarios" deberán incluir "una cantidad razonable para sueldos u otra compensación por servicios personales realmente prestados." Sin embargo, aún antes de la inclusión de esta cláusula en las referidas leyes que expresamente permitía las rebajas por salarios, las Cortes Federales habían resuelto que la amplia frase "gastos ordinarios y necesarios" incluye pagos razonables de sueldos (*Becker Bros.* v. *United States,* 7 F. (2) 3 (C.C.A., 2do Circ., 1925) ; *United States* v. *Philadelphia Knitting Mills Co.,* 273 F. 657 (C.C.A., 3er Circ., 1921) ; *Botany Mills* v. *United States,* 278 U. S. 282, 292).

Nuestra ley ha tenido una historia curiosa. La Sección 32(*a*) de la Ley de Contribuciones sobre Ingresos, desde 1925 al 1927, leía en parte como sigue:

"Sección 32.—(a) Al computar el ingreso neto de una corporación o sociedad sujeta a la contribución impuesta por la sección 28, se admitirán como deducciones:

"(1) Todos los gastos ordinarios y necesarios pagados o incurridos durante el año contributivo en la explotación de cualquier industria o negocio, *incluyendo una cantidad razonable para sueldos u otra compensación por servicios personales realmente prestados. . ."* (Bastardillas nuestras).

La Ley núm. 18, sección 5, Leyes de Puerto Rico, 1927, que entró en vigor el primero de enero de 1928, adicionó la frase "a empleados" después de "compensación" en la rereferida sección. Pero la Ley núm. 30, sección 2, Leyes de Puerto Rico, 1932, que entró en vigor el primero de enero de 1933, eliminó una vez más de esta sección la frase "a empleados", restableciendo la versión original de 1925.

En el presente caso la corte de distrito resolvió que desde el 1928 al 1933, mientras la ley contenía la frase "a empleados", un sueldo pagado al presidente de una corporación no era deducible del ingreso de la corporación sujeto a tributación por el fundamento de que el presidente de una corporación no es un empleado de la misma. Por tanto denegó las deducciones para 1931 y 1932, a pesar de los hechos (a) de que la corte de distrito resolvió que el Presidente había prestado considerables servicios a la Compañía por los cuales la cantidad de $10,000 anuales era una compensación razonable, y (b) de que sostuvo la posición de la Compañía al rebajar el sueldo así pagado de su ingreso sujeto a contribución con respecto al 1933 y 1934, cuando la frase "a empleados" no existía ya en el estatuto.

Este Tribunal ha pasado ya sobre el propósito de la enmienda insertando la frase "a empleados" en el estatuto. "A virtud de la Ley de 1925 la deducción por concepto de sueldos se limitaba a 'una cantidad razonable para sueldos u otra compensación por servicios personales realmente prestados.' Esto, desde luego, incluía los sueldos que se pagaban a los empleados. El objeto de la enmienda fué distin-

guir entre los empleados y los funcionarios cuando se trataba de una corporación, y entre los empleados y los socios gestores de una sociedad en comandita. Se hizo con el fin de fijar una limitación adicional sobre la cantidad de la rebaja. La deducción por salario se circunscribía a los satisfechos a los empleados. La inferencia ineludible es que se excluyeron los sueldos pagados a los socios gestores de una sociedad en comandita *o a los funcionarios de una corporación como tales socios gestores o funcionarios."* (*Moscoso Hnos. & Co., S. en C.,* v. *Domenech, Tes.,* 44 D.P.R. 11, 12; Bastardillas nuestras).

Como se ha indicado en el caso de *Moscoso,* la ley anterior permitía la rebaja de sueldos pagados a empleados. El propósito de la enmienda fué por tanto simplemente excluir las rebajas por el pago de sueldos *a los funcionarios de una corporación como tales funcionarios.* Pero no entendemos que esto significa que al Presidente de una corporación no pueda pagársele compensación por servicios personales realmente prestados más allá de aquellos de una naturaleza meramente rutinaria, como la rendida por algunos presidentes. En síntesis, nada encontramos en el estatuto que prohiba rebajar los sueldos de un empleado, que también es Presidente.

Este tribunal ya ha pasado por implicación sobre este punto. En un caso en que resolvió que la compensación pagada a un socio no podía rebajarse por la sociedad de su ingreso sujeto a contribución, distinguimos el caso de una corporación con el siguiente lenguaje:

"Esto es así porque al socio, por la naturaleza misma del contrato social, no puede ser, en momento alguno, empleado de la sociedad a que pertenece. Es verdad que la sociedad en el Derecho Civil es una persona jurídica distinta de sus socios, pero no es menos cierto que en la sociedad, contrario a lo que sucede respecto al accionista en la corporación, el socio es deudor a la sociedad de su actividad y de su industria, y por consiguiente al trabajar para la sociedad lo hace en cumplimiento de su deber como socio. En la corporación,

el accionista invierte su capital en el negocio y como evidencia de su inversión recibe acciones, pero no está obligado a trabajar para la corporación, la cual desarrolla sus negocios *mediante empleados u oficiales que reciben una compensación por un trabajo que realizan independientemente de su calidad de accionistas, si es que lo son.*'' (M. J. y S. Cabrero, Sucrs. v. Sancho Bonet, Tes., 58 D.P.R. 531, 534; Bastardillas nuestras).

En resumen, resolvemos que la adición de las palabras ''a empleados'' al estatuto da énfasis al hecho de que los sueldos pagados por corporaciones puedan rebajarse del ingreso sujeto a tributación de una corporación solamente en casos de que los servicios se han rendido en verdad. Pero nada encontramos en el estatuto, o en la práctica corporativa, que impida a un funcionario de la corporación, no importa cuál sea su rango, el prestar servicios como empleado amén de aquellos que pueda realizar como cuestión de rutina como tal funcionario. Y si se dedica activamente a tal trabajo como un empleado y se le compensa razonablemente por ello, el estatuto tal como leía desde 1928 al 1933 permitía a la corporación rebajar tales pagos de su ingreso sujeto a tributación.

Nuestra conclusión en este caso se robustece con el hecho de que aun antes de enmendarse la Ley Federal y la nuestra con el fin de que específicamente dispusieran que los gastos ''ordinarios y necesarios'' incluirían ''una cantidad razonable para sueldos u otras compensaciones por servicios personales realmente prestados'', las Cortes Federales resolvieron, como antes se ha dicho, que la amplia frase ''gastos ordinarios y necesarios'' incluía pagos razonables de sueldos. Parece claro, por tanto, que por lo menos en cuanto a tales gastos pagados por corporaciones, la eliminación en el estatuto de la frase ''a empleados'' durante cierto tiempo, tuvo muy poco efecto, si alguno tuvo.

Por tanto creemos que, bajo las circunstancias de este caso, la conclusión a que llegamos para las rebajas de 1931 y 1932 debe ser la misma que la de las rebajas de 1933 y

1934, siempre y cuando los servicios prestados sean substancialmente los mismos para todos los cuatro años. La corte de distrito resolvió que los servicios personales del Presidente en 1933 y 1934 eran substanciales y que la cantidad de $10,000 anuales era razonable para su compensación. Hemos examinado la evidencia y nada encontramos en el récord que justifique la alteración de tal conclusión. (Véanse *Sobrinos de Izquierdo, Inc.* v. *Sancho Bonet, Tes.,* 56 D.P.R. 182; *L. E. Pinkham Med. Co.* v. *Com'r of Internal Revenue,* 128 F. (2) 986 (C.C.A., 1er Circ., 1942); *United States* v. *Reitmeyer,* 11 F. (2) 648 (Dist. Ct., La., 1926).)

Aun cuando la corte de distrito no resolvió expresamente este punto, estamos satisfechos al examinar el récord de que los servicios del Presidente fueron substancialmente los mismos durante los cuatro años en cuestión. Por tanto resolvemos que la corte de distrito actuó correctamente al permitir las rebajas de 1933 y 1934, pero que cometió error al denegar las rebajas de 1931 y 1932.

## IV

■ La última cuestión se refiere a los créditos reclamados por la Compañía para 1931, 1933 y 1934 en las cantidades de $24,743.58, $18,075.86 y $18,629.98, respectivamente. Estas cantidades fueron recibidas en calidad de intereses al tipo del 9 por ciento al año en cuentas vencidas por energía eléctrica suministrada a varios municipios de conformidad con contratos que disponían el pago de tales intereses bajo tales circunstancias.

La Sección 34(*a*) de la Ley de Contribuciones sobre Ingresos (Leyes de Puerto Rico, 1925, pág. 483), lee en parte como sigue:

"Para los fines de la contribución impuesta por la sección 28 solamente se concederán los siguientes créditos:

"(*a*) La cantidad recibida como intereses sobre obligaciones de los Estados Unidos, cualquier subdivisión política del mismo, sobre

obligaciones de El Pueblo de Puerto Rico o de cualquier subdivisión política del mismo. . .''

La cuestión a determinar es si las cantidades así recibidas son ''intereses sobre . . . . obligaciones'' de los municipios envueltos. La Corte Suprema de los Estados Unidos, al examinar una disposición similar, ha dicho que ''De una consideración de toda la sección y del asunto aquí envuelto surge claro que el propósito del Congreso al excluir del ingreso bruto los intereses sobre tales obligaciones, fué ayudar al gobierno federal en su poder para tomar dinero a préstamo. al hacer que sus bonos que devengaban intereses tuvieran más atracción para los inversionistas. *American Viscose Corp.* v. *Com'r of Int. Rev.*, 56 F. (2d) 1033. Compárese *United States Trust Co. of New York* v. *Anderson,* 65 F. (2d) 575, 577–578. El alcance de la palabra 'obligaciones' tal como se empleó allí debe limitarse de conformidad y no extenderse para que incluya intereses sobre obligaciones no incurridas de acuerdo con el poder para tomar dinero a préstamo, tal como lo resolvió correctamente la corte en el caso de *Viscose*.'' (*Helvering* v. *Stockholms Enskilda Bank,* 293 U. S. 84, 87). Véanse *Baltimore & O. R. Co.* v. *Commissioner of Internal Rev.*, 78 F. (2) 460 (C.C.A., 4to Circ., 1935); 121 A.L.R. 1276; 1 Mertens, Law of Federal Income Taxation, Sec. 7.21, pág. 333, Sec. 7.23, págs. 337–8. La mejor y más reciente discusión de esta cuestión se encuentra en *Holley* v. *United States,* 124 F. (2) 909 (C. C.A., 6to Circ., 1942).

Una deuda contraída por suministro de luz eléctrica a una municipalidad no es una deuda contraída en el ejercicio de su poder para tomar dinero a préstamo. Por tanto, la corte de distrito actuó correctamente al sostener la actuación. del Tesorero al rechazar los créditos en cuestión.

*Por las razones aquí expuestas, la sentencia de la corte de distrito será modificada y se dictará una nueva sentencia a favor de la Porto Rico Railway, Light & Power Company*

*concediéndole lo que solicita, con excepción de la reclamación sobre los intereses pagados a la Compañía por los municipios.*