CLÍNICA DR. MARIO JULIÁ, INC., demandante, apelante y apelada, *v.* SECRETARIO DE HACIENDA, demandado, apelado y apelante.

Número 11063.

*Sometido:* 3 de marzo de 1954. *Resuelto:* 17 de mayo de 1954.

---

510

512

*Lino J. Saldaña, Luis F. Sánchez Vilella, C. Morales, Jr.* y *Sarah Torres Peralta,* abogados de los apelantes apelados; *Hon. Secretario de Justicia, José Trías Monge* y *J. C. Santiago Matos, Procurador Auxiliar,* abogados del apelado apelante.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del tribunal.

El Secretario de Hacienda determinó y notificó, el 14 de septiembre de 1951, a la Clínica Dr. Mario Juliá, Inc., ciertas deficiencias en cuanto a la contribución sobre ingresos pagada, o a ser pagada, por la Clínica demandante, durante los años contributivos de 1943 a 1948, ambos inclusive. Las deficien-

cias notificadas, que envuelven la suma de $107,927.25 con los intereses correspondientes, se refieren a las siguientes deducciones que fueron rechazadas por el demandado, Secretario de Hacienda:

(1) Los gastos incurridos por concepto de sueldos y compensaciones por cuatro médicos, que rendían servicio a la contribuyente demandante, y otros cinco empleados de la demandante. Era, y es, la tesis del demandado que tales gastos no eran deducibles porque no habían sido realmente pagados a los médicos y empleados durante cada año contributivo en que la demandante reclamaba tales deducciones.

(2) Parte de los sueldos de $32,000 anuales devengados y pagados en los años 1947 y 1948, al Dr. Mario Juliá, por servicios prestados como Director Médico de la clínica para el tratamiento de enfermos mentales que opera la demandante. Estas deducciones fueron rechazadas por el demandado a base de su alegación de que tal parte de los sueldos representaba ser una compensación excesiva, que no guardaba una relación razonable con el valor de los servicios del Dr. Juliá.

(3) Intereses incurridos y pagados, en los años 1946, 1947 y 1948, por la demandante al fiduciario de unos fideicomisos constituídos por el Dr. Mario Juliá y su esposa en beneficio de sus hijos.

(4) Otras partidas que no están envueltas en esta apelación.

Previa demanda interpuesta por la entidad Clínica Mario Juliá, Inc., en que impugnaba las deficiencias señaladas por el Secretario de Hacienda, la Sala de San Juan del Tribunal Superior dictó una sentencia de la cual han apelado ambas partes para ante este Tribunal. La sentencia apelada contiene varios pronunciamientos que discutiremos separadamente en el curso de esta opinión.

Con respecto a la primera partida ya señalada, relativa a los pagos hechos a cuatro médicos y otros empleados de la demandante, el tribunal a quo resolvió que tales

pagos no eran deducibles en los años contributivos respectivos reclamados por la demandante ya que, aun suponiendo que tales gastos fueron incurridos por la demandante bajo el sistema de contabilidad que ella seguía de "incurrido y devengado" (*accrual basis*), en cada año contributivo de los aquí envueltos, los sueldos y compensaciones rechazados no fueron realmente pagados a esos médicos y empleados durante el año contributivo en que la demandante reclamaba la deducción y que, por lo tanto, bajo la sec. 32(*a*)(1) de nuestra Ley de Contribuciones sobre Ingresos, según la misma fué enmendada por la Ley 159 de 13 de mayo de 1941 ((1) pág. 973), tales gastos no eran deducibles. Ese pronunciamiento ha sido impugnado ante nos por la contribuyente.

De la prueba presentada y de las conclusiones sobre los hechos formuladas por el tribunal de San Juan surge que la contribuyente seguía el sistema de contabilidad de "incurrido y devengado" (*accrual basis*), pero los médicos y empleados en cuestión seguían el sistema de "cobrado y pagado" (*cash basis*) y que tales médicos y empleados devengaban sueldos mensuales que se acreditaban al final de cada mes en las cuentas personales de cada uno en los libros de la entidad, y recibían, además, bonificaciones que se fijaban y acordaban antes de la terminación de cada año contributivo, teniendo tales médicos y empleados la facultad y el poder de girar contra esas cuentas personales y retirar cualquier parte de esos sueldos durante el año contributivo. De acuerdo con los contratos de servicios profesionales otorgados por la demandante y los cuatro médicos, desde el primero de julio de 1946 hasta el 31 de diciembre de 1948, los médicos tenían el derecho a retirar mensualmente, con cargo a su compensación anual, hasta una cantidad máxima de $600 y cada uno tenía derecho a recibir, como compensación total anual, la cuarta parte del 45 por ciento del ingreso neto de la corporación demandante. Al finalizar cada mes se acreditaba la cantidad de $600 en las cuentas personales de cada médico, y antes de

finalizar cada año se computaba la compensación adicional que correspondía a cada uno de los cuatro médicos por concepto de su participación en el ingreso neto de la demandante durante el año, y dichas cantidades se acreditaban también en las cuentas personales de cada médico, contra las cuales ellos podían girar libremente. Como cuestión de hecho, los médicos y empleados no recibieron efectivamente, dentro de cada año contributivo, ciertas partes de la compensación a que ellos tenían derecho, sino que las recibieron en años posteriores. Precisamente las sumas aquí envueltas, constitutivas de las deducciones alegadas, no fueron pagadas realmente, y en efectivo, a los médicos y empleados durante cada año contributivo en que la corporación contribuyente reclama cada deducción, aunque la obligación de hacer tales pagos fué incurrida por la demandante durante cada uno de esos años. Como cuestión de hecho, las sumas aquí envueltas fueron pagadas realmente durante años contributivos posteriores el año en que se reclama la deducción y en que se incurrió en la obligación. Finalmente, quedó establecido el hecho de que los médicos y empleados no eran dueños, ni individual ni conjuntamente, de más del 50 por ciento de las acciones de la demandante, y que la demandante tenía en cada año suficientes recursos económicos para pagar todos los gastos aquí envueltos.

La sec. 32 (a) (1) de la Ley de Contribuciones sobre Ingresos dispone, que al computarse el ingreso neto de una corporación o sociedad se admitirán como deducciones "todos los gastos ordinarios y necesarios pagados o incurridos durante el año contributivo en la explotación de cualquier negocio o industria. *Disponiéndose*, que tales gastos, sueldos, rentas y pagos, *no serán deducibles si no se pagan realmente durante el año contributivo*, o si, bajo el sistema de contabilidad utilizado por la persona a quien tales pagos han de hacerse, el importe no hubiere sido incluído en su ingreso bruto durante el año contributivo a menos que hubiesen sido realmente pa-

gados. *Disponiéndose, además,* que tales pagos o gastos sólo serán deducibles si se comprobâre a entera satisfacción del Tesorero que los mismos son razonables en cuanto a los casos en que la corporación o sociedad que hace estos pagos o gastos posee más del cincuenta (50) por ciento de las acciones emitidas (*outstanding stock*) o del capital social de la corporación o sociedad, respectivamente, que recibe tales pagos, o si la corporación o sociedad que recibe tales pagos posee más del cincuenta por ciento de las acciones emitidas (*outstanding stock*) o del capital social de la corporación o sociedad, respectivamente, que hace tales pagos o que incurriere en tales gastos, o si el individuo que recibe tales pagos de la corporación o sociedad, en concepto de gastos, posee más del cincuenta (50) por ciento de las acciones emitidas (*outstanding stock*) o del capital social de la corporación o sociedad, respectivamente, que hace tales pagos."

A la luz del primer "disponiéndose" (proviso) arriba transcrito, es claro que el legislador ha dispuesto que no será deducible un gasto, en aquellos casos en que la contribuyente que hace el pago sigue un sistema de "incurrido y devengado" (*accrual*) si (1) el gasto no ha sido pagado realmente en el año contributivo correspondiente y (2) si la persona que ha de recibir el pago sigue el sistema de "cobrado y pagado" (*cash basis*). Todos estos requisitos han sido cumplidos en este caso y, por lo tanto, no son deducibles las partidas en controversia. La contribuyente que incurrió en los gastos tiene un sistema de incurrido y devengado; las personas que habían de recibir los pagos tenían un sistema de cobrado y pagado y, aunque tales personas o empleados tenían derecho a recibir los pagos en cada año contributivo en que se incurrió en la obligación de hacer tales pagos, sin embargo, los gastos no fueron pagados realmente a ellos durante los años contributivos correspondientes.

■■ Alega la contribuyente que el primer "Disponiéndose" que acabamos de discutir debe ser considerado, insepa-

rablemente, en conexión con el segundo y último "Disponiéndose", que alega la contribuyente que establece un requisito adicional para que las partidas no sean deducibles, cuyo requisito no ha sido cumplido en este caso.  Indica la contribuyente que, aunque expresado en forma imperfecta, fué el propósito legislativo, a través del segundo y último Disponiéndose, el de determinar que ciertos gastos de una corporación no serían deducibles, al no ser pagados realmente, solamente si la persona que ha de recibir los pagos tiene el dominio o "control" de más del cincuenta por ciento de las acciones de la corporación, lo cual no ocurre en este caso.  Alega la contribuyente que la literalidad en la expresión estatutaria debe ceder y quedar subordinada al *desideratum* esencial de llevar a cabo el propósito legislativo.  Especialmente, la contribuyente expone que la sec. 24 (c) de la ley federal de Contribuciones sobre Ingresos (según enmendada en el año 1937), sirvió de modelo o patrón para nuestra sec. 32 (a) (1), y que bajo la sec. 24 (c) de la ley federal es un requisito indispensable, para que los gastos incurridos y no pagados no sean deducibles, el que exista la relación de dominio o "control" de la corporación.

Tendría razón la contribuyente si se hubiese incorporado a nuestro estatuto, sustancial, aunque no literalmente, la sec. 24 (c) federal.  Dicha sec. dispone lo siguiente:

"Gastos e intereses no pagados.  Al computar el ingreso neto no se permitirá deducción alguna con respecto a gastos incurridos bajo la sec. 23 (a) o a intereses devengados bajo la sec. 23 (b):

"(1) Si ellos no han sido pagados dentro del año contributivo o dentro de los dos meses y medio posteriores a la terminación del año contributivo; y

"(2) Si, en virtud del método de contabilidad de la persona a quien han de hacerse los pagos, las sumas envueltas, de no ser pagadas, no podrían ser incluídas en el ingreso bruto de tal persona en el año contributivo que corresponda al año contributivo del contribuyente; y

"(3) Si, a la terminación del año contributivo del contribuyente, o en cualquier fecha dentro de los dos meses y medio posteriores, tanto el contribuyente como la.persona a quien el pago ha de hacerse, son personas entre las cuales las pérdidas no serían deducibles bajo la sec. 24(*b*)". (Relación de "control".)

En síntesis, lo que dispone la sec. 24(*c*) es lo siguiente (25 *Taxes, The Tax Magazine*, 637):

No se permitirá la deducción (1) si no se hace el pago dentro del año contributivo o dentro de los dos meses y medio posteriores; (2) si el acreedor sigue el sistema de "cobrado y pagado" (*cash basis*) y (3) *si existe la relación de dominio o control de más del cincuenta por ciento de las acciones.*

Fué el propósito de esa disposición el de obstaculizar la evasión del pago de contribuciones, ya que, antes de aprobarse esa disposición, en aquellos casos en que el acreedor o empleado de una corporación tuviese el dominio de la mayoría de las acciones de la corporación, el acreedor o empleado y la corporación podían artificialmente hacer aparecer una obligación como incurrida en los libros de la corporación, en el año contributivo que fuese más favorable a la corporación, y posponer artificialmente el pago al acreedor o empleado hasta el año contributivo que fuese más favorable al acreedor o empleado, y fué el propósito de la sec. 24(*c*) el evitar la continuación de esa práctica. Seidman's, *Legislative History of Federal Income Tax Laws*, pág. 202; Mertens, *Law of Federal Income Taxation*, vol. 4, sec. 25.10, pág. 325; *P. G. Lake Inc.*, 4 T. C. 1, 3, confirmado en 148 F.2d 898; 2 Tax L. Rev. 284; 25 *Taxes* 137; 25 *Taxes* 637. En vista de tal propósito legislativo y de la fraseología precisa de la sec. 24(*c*), los tres requisitos deben coexistir simultáneamente, esto es, el acreedor o empleado debe estar bajo el sistema de "cobrado y pagado", el pago debe haberse hecho en el año contributivo y debe existir la relación de dominio o control de la mayoría de las acciones. *Michael Flynn Manufacturing Co.* v. *Comm.*, 3 T. C. 932, 936; *P. G. Lake Inc.*, supra; *Fincher Motors Inc.*,

43 B.T.A. 673; *Ohio Battery & Ignition Co.*, 5 T. C. 283; 25 *Taxes* 637. Precisamente el factor *sine cua non* debe ser el del dominio de la mayoría de las acciones, ya que sin tal relación de control quedarían reducidas sustancialmente las probabilidades de manipulación de los pagos a los fines de evitar el pago de contribuciones.

Si nuestra sec. 32 (*a*) (1) hubiese correspondido sustancialmente, aunque a través de una fraseología imperfecta, a la sec. 24 (*c*) federal, sería fácil la solución del problema. Si, por ejemplo, después del primer "Disponiéndose", relativo a la necesidad del pago real en el año contributivo se hubiere añadido un segundo "Disponiéndose" al efecto de que los pagos no serían deducibles si son hechos por una corporación a una persona o empleado que tiene el dominio de la mayoría de las acciones, habría habido margen para llegar a la conclusión de que tal requisito era adicional a los otros, y de que el segundo "disponiéndose" equivalía a la conjunción "y" utilizada en el estatuto federal, ya que un "disponiéndose" puede ser interpretado en conexión con otros "disponiéndose" en la misma sección a los fines de llevar a cabo el propósito legislativo que pueda surgir de la totalidad de la sección. Sutherland, *Statutory Construction*, vol. 2, pág. 469, et seq., sec. 4932 a 4934; 82 C.J.S. 884 et seq., sec. 381. Pero el segundo disponiéndose en controversia se aparta totalmente de la sec. 24 (*c*) federal. Determina que los gastos incurridos por una corporación con respecto a una persona o empleado que tenga el dominio de la mayoría de las acciones serán deducibles solamente cuando tales gastos sean razonables. Suponiendo que los gastos sean razonables, (y en este caso no hay controversia en cuanto a su razonabilidad, en cuanto a los cuatro médicos y empleados), tales gastos son deducibles, aun si media la relación de control. El estatuto federal dispone absolutamente que el hecho de la relación de control de las acciones (cumpliéndose los demás requisitos) implica que los gastos no son deducibles. Nuestro estatuto dispone, en forma contraria

y antagónica al federal, que aun si media el control de las acciones, los gastos son deducibles, si ellos son razonables.

Naturalmente, la disposición que estamos discutiendo tiende a anular y destruir el propósito legislativo encarnado en el estatuto federal de obstaculizar la evasión del pago de contribuciones mediante la manipulación artificial de los pagos. En el contexto de la sec. 24 (c) federal, tal propósito tiene vigencia y virtualidad solamente cuando media la relación de control. Pero si nuestro legislador decidió no adoptar ese propósito legislativo federal, y decidió que, no obstante la relación de control, los gastos podrían ser deducibles si son razonables, no es función nuestra el dejar sin efecto, judicialmente, tal decisión.

■ Penetrando en un campo de análisis más amplio en cuanto a las categorías de poderes legislativos y judiciales en situaciones peculiares como la que se presenta en este caso, en que se adopta parte de una sección federal e inmediatamente se elimina la razón de ser de esa primera parte, cuya razón de ser inspiró al legislador federal, es cierto que los tribunales, generalmente, pueden rechazar una interpretación exactamente literal que conduzca a consecuencias absurdas, irrazonables o no sensatas. *Lozada* v. *Antonio Roig, Sucrs.*, 73 D.P.R. 266; *Pueblo* v. *Mantilla*, 71 D.P.R. 36; *Rivera* v. *Quiñones*, 70 D.P.R. 318; *Pueblo* v. *De Jesús*, 70 D.P.R. 37; Mertens, ob. cit., tomo 1, pág. 61, 63, sec. 3.04. De otro lado, la literalidad puede ser ignorada por los tribunales solamente cuando ella es claramente contraria a la verdadera intención o propósito legislativo, según tal propósito o intención puede surgir de la totalidad del estatuto, o de la totalidad de la sección envuelta. Mertens, ob. cit., tomo 1, pág. 62. Por ejemplo, este Tribunal se ha negado a imprimirle eficacia a una disposición literal de la Ley de Contribuciones sobre Ingresos cuando ella es antagónica a o incompatible con otra disposición general de esa misma ley, que expresa la verda-

dera intención legislativa. *Roig Commercial Bank* v. *Buscaglia, Tes.*, 74 D.P.R. 986, 997, 998.

Pero esos son casos que envuelven contradicciones internas en el propio estatuto, correspondiendo entonces a los tribunales el resolver tal contradicción a base del establecimiento de la intención auténtica del legislador. Ese propósito no debe ser el del juez, sino el del legislador, según surja del estatuto en sí. El juez es un intérprete, y no un creador. Su facultad de interpretación adquiere relevancia cuando del estatuto surgen varios significados probables que suministren un margen adecuado para selección judicial, pero si el lenguaje es tan inequívoco que postula un solo significado, un sentido cabal de humildad y autodisciplina judicial requiere la aplicación de la voluntad legislativa. Frankfurter, "Some Reflections on the Reading of Statutes", 47 Col. L. Rev. 527; 1 Mertens 59. Ese es un postulado del honor judicial. Mertens, ob. cit., t. 1, pág. 63. Ya este Tribunal ha indicado que si el lenguaje de una sección de la Ley de Contribuciones sobre Ingresos referente a la deducción de intereses es inequívoco, los tribunales no pueden suplir omisiones, ya que el suplirlas trasciende los límites de la función judicial. *Comunidad Fajardo* v. *Tribunal de Contribuciones*, 73 D.P.R. 543. En el caso de *Crooks* v. *Harrelson*, 282 U. S. 55, la Corte Suprema de los Estados Unidos dijo:

"Los tribunales, en ocasiones, han actuado con un gran grado de habilidad en sus esfuerzos por encontrar alguna justificación para arrancar de las palabras de un estatuto un significado no expresado literalmente, para poder escapar de consecuencias consideradas como absurdas o severas. Pero la aplicación de este principio se aproxima tanto a las fronteras entre el ejercicio del poder judicial y el del poder legislativo, que se requiere una gran cautela y circunspección para evitar que se lleve a cabo una usurpación del poder legislativo. No es suficiente el que una ley produzca consecuencias severas o absurdas . . . . . En ese caso el remedio a tal situación debe ser suministrado por la autoridad legislativa y no por la Corte."

En el caso de *Haggar Co.* v. *Commissioner*, 308 U. S. 389, se dice:

"Los estatutos deben ser interpretados a la luz de su propósito. Una lectura literal de ellos que conduzca a consecuencias absurdas debe ser evitada cuando se le pueda dar una aplicación razonable que sea consistente con sus palabras y con el propósito legislativo. La interpretación judicial siempre debe ser consistente con las palabras del estatuto."

Con respecto al problema aquí planteado, no podemos convenir con la contribuyente con que el segundo disponiéndose que estamos considerando debe ser interpretado en forma contraria a lo que dice expresamente, esto es, que deba ser interpretado como disponiendo que los gastos no serán deducibles si media la relación de control de las acciones, o que tal relación sea una condición previa al rechazo de la deducción, cuando el "disponiéndose" taxativamente señala, en forma inequívoca, que serán deducibles los gastos razonables, aun si media la relación de control. No se trata en este caso de una contradicción entre distintas partes de la ley o de una sección, en que el juzgador pueda seleccionar aquella parte que corresponda al propósito legislativo, ni de un error gramatical, ni del uso indebido de alguna conjunción, en cuyos casos el tribunal podría darle efecto a la intención legislativa para evitar consecuencias absurdas. De ninguna parte de la ley surge que el propósito legislativo haya sido el de negar una deducción por gastos razonables cuando exista la relación de control de las acciones de una corporación. Podría ser peculiar el resultado del segundo "disponiéndose" pero tal peculiaridad es cuestión a ser considerada por el legislador, y no por el poder judicial.

Podría argumentarse que el primer "disponiéndose", al efecto de que no serán deducibles los gastos que no sean realmente pagados durante el año contributivo, carece de razón de ser y de sentido al eliminarse el requisito de la relación de control de acciones y que, por lo tanto, al elimi-

narse la base de la estructura, el primer "disponiéndose" quedaría en el vacío, hasta el punto de que debe ser ignorado y considerado como no existente. Pero, en primer término, no debemos borrar judicialmente una disposición legislativa, a menos que se demuestre que ella es contraria al propósito legislativo. En segundo término, puede haber una explicación legítima para que quede en pie, aisladamente, la disposición al efecto de que, en cuanto a un contribuyente que siga el método de "incurrido y devengado", no serán deducibles los gastos que no sean realmente pagados durante el año contributivo en que se incurrió en la obligación de hacer tales pagos. Una deducción es una gracia legislativa y un privilegio, y podría ser eliminada por el legislador. *Cittadini* v. *Commissioner of Internal Revenue*, 139 F.2d. 29. Del poder absoluto del legislador de denegar una deducción surge el poder incidental de concederla sujeto a los límites y restricciones que el legislador tenga a bien establecer. Si determinada restricción es justa o injusta, razonable o irrazonable, es cuestión a ser resuelta por el legislador, y no por los tribunales. En este caso el legislador ha dispuesto que, independientemente de si existe o no una relación de control, se concederá una deducción por gastos incurridos solamente si los gastos son realmente pagados durante el año contributivo correspondiente. Se ha concedido esa deducción sujeto a esa restricción específica. No se trata entonces de llevar a cabo propósito alguno de obstaculizar la evasión de contribuciones, sino que se trata de llevar a cabo otro propósito distinto, el de conceder una deducción en forma específicamente limitada. Si ello perjudica a los contribuyentes bajo la base de "incurrido y devengado", o si ello reduce la eficacia del método en sí del "accrual", como alega la demandante en este caso, ello es cuestión a ser resuelta por el legislador. Por lo menos, este Tribunal no puede, a base de esas consideraciones, eliminar judicialmente la restricción que se ha impuesto sobre la deducción de gastos. Desde el punto de vista del propósito de impedir la evasión de

contribuciones, el primer "Disponiéndose", aisladamente, puede estar en el vacío. Pero desde el punto de vista del propósito de establecer restricciones sobre una deducción, el primer "disponiéndose" tiene efectividad legal.

■ Alega la contribuyente que, aunque los médicos y empleados no recibieron efectivamente los pagos, ellos, que seguían el método de "cobrado y pagado" (*cash basis*), tenían, en el año contributivo en que incurrió en la obligación, el poder absoluto e incondicional para recibir tales pagos y para retirar y obtener las sumas envueltas cuando ellos así lo deseasen, dentro de ese año contributivo, y que la existencia de tal poder equivalía a un pago implícito (*constructive payment*) aun si no se ejercita tal poder. *Rubert* v. *Tribunal de Contribuciones y Tesorero*, 74 D.P.R. 51, 67. Por lo tanto, alega la contribuyente que se cumplió con el requisito del pago, señalado por la sección 32 (*a*) (1). Como ya hemos visto, la sec. 24 (*c*) de la Ley federal de Contribuciones sobre Ingresos exige que se hayan pagado las sumas de dinero envueltas en los gastos en el año contributivo en que se incurrió en la obligación. Bajo esa disposición, se ha planteado una controversia sobre si el pago implícito satisface los requisitos de esa sección. 2 Tax. L. Rev. 284; 25 *Taxes* 137: "Confusion in 24 (*c*)"; y 25 *Taxes* 637. Pero bajo nuestra sec. 32 (*a*) (1) no hay margen para tal controversia. La ley federal exige que los gastos hayan sido *pagados*. Nuestra ley va más lejos y exige específicamente que los gastos hayan sido pagados *realmente*. Tal adición demuestra claramente que fué la intención de nuestro legislador el requerir el pago, efectivo, actual, concreto y real. El pago implícito no satisface ese requisito.

■ Actuó correctamente el tribunal a quo al rechazar las deducciones en cuanto a la compensación de los médicos y empleados en el año contributivo en que la contribuyente incurrió en la obligación de pagar tal compensación. Pero el tribunal sentenciador admitió tales deducciones en los años

posteriores en que tal compensación fué realmente pagada. El Secretario de Hacienda ha apelado ante nos de ese pronunciamiento y alega, en síntesis, que bajo la sec. 32 (a) (1), la deducción por pagos hechos por un contribuyente que funciona a base del método de "incurrido y devengado" (accrual) puede concederse solamente si los pagos se hacen realmente en el año en que se incurrió en la obligación (year of accrual), y no procede la deducción si los pagos reales se hacen en años posteriores al año contributivo en que se incurrió en la obligación.

Como punto de partida a la discusión de este problema, se hace preciso el hacer referencia de nuevo a la sec. 24 (c) de la ley federal de Contribuciones sobre Ingresos, según fué enmendada en el año 1937. Como ya hemos visto, tal sección dispone, esencialmente, que, al computarse el ingreso neto, no se permitirá deducción alguna con respecto a gastos incurridos, si ellos no han sido pagados dentro del año contributivo o dentro de los dos meses y medio posteriores al año contributivo, si el empleado o acreedor que recibe los pagos sigue el método de "cobrado y pagado" y si existe la relación de control. Se ha indicado que, de seguirse una interpretación estricta de tales disposiciones del estatuto federal, de no concederse una deducción en el año en que se ha incurrido en una obligación, por no haberse hecho el pago durante ese año, (suponiendo una relación de control), no podría concederse la deducción en ningún otro año posterior en que se haga el pago, y se perdería la deducción perpetuamente. 4 Mertens, ob. cit., págs. 534, 535, sec. 26.10, escolio 12; 2 Tax L. Rev. 137. La sec. 24 (c) se refiere exclusivamente a gastos incurridos. Al requerirse, como condición previa a que se reconozca una deducción, que tales gastos incurridos se paguen durante el año contributivo, o dentro de los dos meses y medio posteriores, el estatuto federal hace referencia al año contributivo en que se hayan incurrido los gastos. Esto es, se dispone esencialmente que procederá una deducción solamente si los pagos

se hacen en el año contributivo en que se ha incurrido en la obligación, o dentro de los dos meses y medio posteriores, y no procederá la deducción en años posteriores a aquél en que se ha incurrido en la obligación, aun si los pagos se han hecho en esos años posteriores. Una llave a la solución del problema consiste en la determinación de la identidad del año contributivo. Considerando la cláusula que se refiere al "año contributivo" en conexión con la cláusula general anterior que se refiere a "gastos incurridos", surge implícitamente la expresión total "año contributivo en que se ha incurrido en los gastos", como determinante del año en que procede la deducción.

Como ya hemos visto, nuestra sec. 32 (a) (1) exhibe algunas diferencias con la 24 (c) federal. En lo relevante a la cuestión en controversia, dispone la 32 (a) (1) que se admitirán como deducciones "todos los gastos ordinarios y necesarios *pagados o incurridos durante el año contributivo* . . . Disponiéndose, que tales gastos, sueldos, rentas y pagos, no serán deducibles *si no se pagan realmente durante el año contributivo.*" (Bastardillas nuestras.) Nuestra sec. 32 (a) (1) no se refiere exclusivamente a gastos incurridos, como lo hace la federal, sino que establece una alternativa, de gastos incurridos o gastos pagados durante el año contributivo. Surge de tal alternativa que el "año contributivo" en que se pueda conceder una deducción por pagos realmente hechos durante ese año no tiene que ser exclusivamente el año contributivo en que se incurra en la obligación, sino que también puede ser el año contributivo en que los gastos son pagados. Tal interpretación es consistente con el propósito de la sec. 32 (a) (1) que es, no el de obstaculizar evasiones a la contribución sobre ingresos, sino el de limitar la deducción a aquellos casos en que los gastos son realmente pagados. La deducción es función del pago real, y debe adherirse a la fecha en que se hace el pago real. Ya hemos visto que no obstante el hecho de que se haya incurrido la obligación en determinado año,

si el pago real no se verifica en ese año, no procede la deducción. El acontecimiento relevante es el pago real, y no el acto de incurrir en la obligación. Es el propósito del legislador el ignorar el hecho de que el contribuyente esté bajo la base de "incurrido y devengado" (*accrual*), si los pagos no se hacen realmente. En sentido contrario, debe ignorarse el método seguido de "incurrido y devengado" a los fines de conceder una deducción en el año del pago real. Si el hecho de que la obligación se haya incurrido en determinado año no sirve de obstáculo al rechazo de la deducción si en ese año el gasto no se ha pagado realmente, tampoco debe servir de obstáculo ese hecho a la concesión de la deducción cuando se hace el pago real. Lo importante no es el método de *accrual*, sino el hecho del pago real. Esa tesis sirve de explicación legítima a la actuación de nuestro legislador al apartarse del criterio federal de identificar el año contributivo con aquél en que se incurra la obligación, y al establecer la alternativa de "gastos pagados", esto es, la alternativa del año contributivo en que se pague la obligación.

El demandado alega que el pronunciamiento del tribunal sentenciador ahora en discusión destruye la eficacia y razón de ser del método de *accrual*. Pero ya hemos visto, al resolver que los gastos no eran deducibles en el año en que se incurrió en la obligación, si no habían sido realmente pagados, que tal resultado podría afectar adversamente el sistema de *accrual*, pero que ello es cuestión a ser resuelta por el legislador. Lo esencial es que el legislador decidió enfatizar el hecho del pago real, quedando subordinado el método de contabilidad. El mismo criterio es aplicable al caso inverso que ahora nos ocupa, en que el tribunal sentenciador actuó correctamente al conceder deducciones en los años en que los gastos fueron realmente pagados, independientemente del año en que las obligaciones fueron incurridas, e independientemente del método de "accrual" seguido por la contribuyente. No podemos colocarnos en la posición de imputarle al legislador la inten-

ción de negarle eficacia al método de "accrual" a los fines de negar las deducciones si los pagos no se hacen realmente, y al mismo tiempo establecer de nuevo la eficacia del método de "accrual" para negar también las deducciones cuando los pagos se hacen realmente.

Otro pronunciamiento del tribunal sentenciador que ha sido impugnado ante nos por la contribuyente se refiere a la razonabilidad de los sueldos de $32,000 anuales pagados en los años 1947 y 1948 al Dr. Mario Juliá como Director Médico de la entidad contribuyente. Durante el año 1946 el Dr. Juliá había devengado un sueldo de $12,000, pero en los años 1947 y 1948 ese sueldo le fué aumentado a $32,000 anuales. Sobre este punto, el tribunal a quo formuló, en parte, las siguientes conclusiones de hecho:

"Durante los años en controversia el Dr. Mario Juliá ocupó el cargo de Director Médico de la demandante. Como tal, él traza las normas en cuanto a clases de tratamientos, selección de especialistas, trabajo social, trabajo vocacional y de rehabilitación, supervisa a los demás médicos y todo el personal, y comprueba que las normas sentadas sobre el particular se cumplan propiamente; vela porque el nivel profesional e institucional de la Clínica sea igual al de otras instituciones en Estados Unidos y en el extranjero para lo cual debe visitar y ha visitado dichas instituciones; discute con el 'staff' médico las normas profesionales y su aplicación, y en general dirige la institución, tanto en lo profesional como en lo económico. El Dr. Juliá como tal Director Médico es la persona que se encarga directamente de los contratos para la obtención de pacientes veteranos, y realiza los contactos necesarios con la Administración de Veteranos tanto en Puerto Rico como en Estados Unidos.

"De 1943 a 1949 el ingreso recibido por la demandante por concepto de pacientes veteranos ascendió de $167,396.75 en 1943 representando un 68.48% de todos sus ingresos, a $602,715.36 en 1949 representado un 79.63% del total. Los ingresos de pacientes privados ascendieron de $75,441.66 en 1943 a $154,210.14 en 1949. · De 1943 a 1949 la demandante tuvo un total de ingresos de $3,748,202.50 de los cuales 74.36% o sea $2,787,823.35

correspondió a los pacientes veteranos y $955,616.37 a pacientes privados más otros ingresos montantes a $4,762.78 ([7-A])."

En su opinión, el tribunal de San Juan indicó lo siguiente:

"(3) Durante los años 1947 y 1948 el Dr. Juliá poseía el 50.48% de las acciones de la demandante. Los fideicomisos creados por él para beneficio de sus hijos menores poseían otros 48.10% para un total de 98.58%. Quiere decir que un 98.58% de todas las ganancias de la demandante correspondían al Dr. Juliá y a sus hijos.

"Durante el año 1946 el Dr. Juliá devengó un sueldo de $12,000. Habiendo fijado la demandante dicho sueldo y habiéndolo aceptado el Dr. Juliá con conocimiento ambos de la labor que éste realizaba, debemos concluir que en cuanto a ellos dicho sueldo era uno razonable. El ingreso por concepto de pacientes para el año 1946 ascendió a $578,739.16. El sueldo del Dr. Juliá en dicho año en la suma de $12,000 representaba pues un .021% aproximadamente de dicho ingreso. En 1947 el ingreso aumentó a $698,878.14 siendo el aumento mayormente en relación con los pacientes veteranos. En 1948 el ingreso aumentó a $733,044.78 siendo la totalidad de dicho aumento, con excepción de $307, en relación con los veteranos.

"Si bien es cierto que de 1946 a 1948 los ingresos de la demandante aumentaron, el aumento fué mayormente debido a pacientes veteranos en cuyo campo la demandante no tenía que vencer competencia alguna en contra en Puerto Rico por ser la única institución privada para tratar casos mentales. Sin ignorar la labor del Dr. Juliá como Director de la clínica, puede decirse que dichos aumentos fueron más bien el resultado natural del aumento de pacientes veteranos a partir de 1946 a medida que los soldados iban siendo licenciados de la Segunda Guerra Mundial y regresaban a Puerto Rico. Por otra parte, es innegable el hecho que el aumento en los ingresos tenía relación directa con un aumento en el número de pacientes y por ende más trabajo para el Dr. Juliá. Partiendo de la base que para la demandante la compensación del Dr. Juliá en 1946 era razonable y para éste también, y esa compensación representaba un .021% de los ingresos por concepto de pacientes, una com-

"([7-A]) En 1946 el ingreso de la demandante fué de $425,550.50 de veteranos y $153,188.66 de otros pacientes; total: $578,739.16. En 1947 fué $526,829.77 veteranos y $172,048.37 privados; total: $698,878.14. En 1948 fué $560,688.82 veteranos y $172,355.96 privados; total: $733,044.48."

pensación en igual proporción para los años 1947 y 1948 sería también razonable. Para el año 1947 ascendería a poco menos de $15,000 y para el 1948 a poco más de $15,000. El Tribunal concluye que la demandante tiene derecho a deducir por concepto de compensación razonable del Dr. Juliá $15,000 en 1947 y $15,000 en 1948. Cualquier cantidad en exceso equivaldría a un pago de beneficios bajo el nombre de salarios."

El Dr. Juliá tenía el control de la mayoría de las acciones de la corporación contribuyente. Recaía sobre la contribuyente el peso de la prueba para demostrar que los sueldos en cuestión eran razonables, y debe rechazarse una deducción por salarios a menos que se demuestre su razonabilidad. 4 Mertens 408, sec. 25.49; *Lydia E. Pinkham Medicine Co.* v. *Commissioner*, 128 F.2d 986, primer circuito; *Sportwear Hosiery Mills* v. *Comm.*, 129 F.2d 376. Existiendo una relación de dominio de la mayoría de las acciones, o mediando una corporación íntima o de familia (*close or family corporation*), el contribuyente debe ofrecer una prueba más robusta de razonabilidad que en otras situaciones. *P. R. Ry., L. & P. Co.* v. *Buscaglia*, 62 D.P.R. 597, 612. En esos casos los salarios deben ser escudriñados o examinados con cuidado y cautela, a los fines de que se determine si ellos son realmente salarios, o si son más bien un disfraz para la distribución de beneficios. *Sobrinos de Izquierdo* v. *Sancho Bonet*, 56 D.P.R. 182. Si sueldos pagados por una corporación son o no razonables, es una cuestión de hecho a ser determinada por el tribunal de primera instancia, y su conclusión será alterada sólo en el caso de que de los autos no aparezca suficiente evidencia para sostenerla. *Buscaglia* v. *Tribunal de Contribuciones*, 69 D.P.R. 514; *Casanova y Cía.* v. *Soltero*, 61 D.P.R. 653, en que se sostuvo la determinación del anterior Tribunal de Contribuciones, que estaba basada en una comparación de los sueldos con el volumen de ventas.

Naturalmente, la razonabilidad de unos sueldos no se presta a fórmulas matemáticas ni a criterios rígidos y exactos, y cada caso debe resolverse de acuerdo con sus propios hechos y circunstancias peculiares. *Patton* v. *Comm.*, 168

F.2d 28. Pero existen varios criterios generales que sirven de puntal de referencia, como, por ejemplo, la proporción del pago en relación con el ingreso bruto (como se hizo en este caso), o con el ingreso neto o el volumen de los negocios; la relación de dominio o control de las acciones, y si la compensación guarda relación con el dominio de las acciones o con la cuantía de los beneficios distribuídos; la naturaleza intrínseca de los servicios prestados, y su calidad, necesidad o indispensabilidad; los méritos y calificaciones del empleado y su utilidad a la firma, y el efecto de sus servicios y gestiones en cuanto al bienestar económico de la firma; las compensaciones pagadas en años anteriores por servicios similares y la comparación con lo pagado por otras compañías en servicios similares. *P.R. Ry. L. & P. Co.* v. *Buscaglia,* supra; *Buscaglia* v. *Tribunal de Contribuciones,* 65 D.P.R. 361, 366; 4 Mertens, sec. 25.49 et seq.

Los salarios pagados en años anteriores son relevantes, aunque no constituyen una guía completamente satisfactoria, ya que podían haber sido irrazonablemente bajos. 4 Mertens 422, sec. 25.59. Pero si los salarios, en comparación con años anteriores, son aumentados en forma excesiva, sin que medie una explicación adecuada para el aumento, y sin que estén justificados por los hechos, por ejemplo, si el aumento en los ingresos de la contribuyente no se deben especialmente a una recién desarrollada pericia, o a nuevos servicios adicionales del empleado, el aumento sería irrazonable. 4 Mertens 422, escolio 45, y Suplemento del año 1953. En este caso, el salario anterior de $12,000 era razonable, considerando el hecho de que representaba ser un .021% del ingreso bruto, conjuntamente con el hecho de que se trata de una corporación dominada por el Dr. Juliá. Naturalmente, no puede establecerse un porcentaje fijo o exacto de los ingresos como punto determinante. Pero, en este caso, el .021% de los ingresos brutos representaba ser un salario razonable. Precisamente en el caso citado de *P.R. Ry. L. & P. Co.* v. *Buscaglia,* supra, se consideró razonable una compensación

que constituía el 2½% del ingreso bruto. El salario de $12,000 pagado al Dr. Juliá en el año 1944 representaba ser un 13% del ingreso neto. En vista de todo ello, los salarios de $12,000 pagados antes del 1947 no eran irrazonablemente bajos y pueden servir como base de comparación. Procede determinar si el aumento habido, de $12,000 a $32,000 estuvo justificado por el aumento en los ingresos que se registró en los años 1947 y 1948. El ingreso bruto de la contribuyente en el año 1946 fué el de $579,102.31; el cual aumentó en el año 1947 a $700,827.69 y en el año 1948 a $733,118.03. Admitiendo los méritos y calificaciones del Dr. Juliá, la utilidad de sus servicios a la contribuyente y el aumento en sus labores y en su margen de responsabilidad debido al aumento en el volumen de los negocios de la demandante (por lo que el tribunal sentenciador reconoció como razonable un aumento en su salario de $12,000 a $15,000 anuales), sin embargo, una destacada proporción de los aumentos en los ingresos se debió a un aumento sustancial de pacientes que eran veteranos de la guerra, siendo la clínica de la contribuyente la única clínica privada de su clase en Puerto Rico. Si el aumento en el volumen del negocio se debe, en su mayor parte, a las condiciones de guerra, la concesión de una compensación razonable no se puede basar enteramente en el aumento en el ingreso bruto. *Locke Mach. Co.* v. *Comm.*, 168 F.2d 21, citado en Mertens, Tomo 4, Suplemento del año 1953, sec. 25.56, escolio 24; *Wood Roadmixer Co.* v. *Commissioner*, 8 T. C. 247, en que se dice, a las páginas 254 y 255: "Es evidente que el gran volumen de negocios en el 1941 no se debió a ningún programa especial de anuncios, ni a ninguna actividad poco usual de los funcionarios y empleados de la peticionaria, pero se debió primordialmente a la actividad del gobierno al construir defensas nacionales, que puso en demanda el artículo producido por la peticionaria. Fué ese factor, más que cualquier otro, lo que influyó en el éxito del negocio de la peticionaria."

Lo que hizo el tribunal sentenciador fué el resolver que los salarios anteriores de $12,000 eran razonables y que debía aplicarse el mismo porcentaje al ingreso bruto de años posteriores, para establecer un aumento de $12,000 a $15,000. No podemos decir que la aplicación del mismo porcentaje del ingreso bruto a todos los años sea una fórmula absoluta, válida para todos los casos, por ejemplo, la inflación ocurrida en años recientes podría justificar un aumento en los salarios. Pero, en vista de las circunstancias de este caso, en cuanto al origen del aumento en los negocios; en cuanto a la posición única de la contribuyente en lo relativo a la ausencia de competencia y en cuanto al hecho de que el Dr. Juliá controlaba la mayoría de las acciones corporativas y obtenía la mayor parte de los beneficios netos de la entidad, llegamos a la conclusión de que la conclusión del tribunal de primera instancia, en cuanto a la razonabilidad del salario del Dr. Juliá está sostenida por la evidencia, y no debe ser dejada sin efecto por este Tribunal.

Ambas partes han apelado ante nos de un dictamen del tribunal de San Juan relativo a unas deducciones de ciertos intereses sobre deudas de la contribuyente, pagados por la contribuyente a unos fideicomisos creados por el Dr. Mario A. Juliá y su esposa en beneficio de sus dos hijos. El 26 de diciembre de 1945 el Dr. Mario Juliá y su esposa constituyeron un fideicomiso a favor de sus dos hijos, entonces menores de 21 años de edad. Se nombró como fiduciario a Ramón Collazo, quien tenía amplias facultades de administración y de reinversión. Durante la vida del fideicomiso, los fideicomisarios o beneficiarios percibirían anualmente, cada uno, un *25% de los ingresos netos* producidos por los fondos en fideicomiso, sin exceder de $2,400 cada uno. El remanente de las ganancias podría ser reinvertido. En enero de 1949 el fiduciario entregaría a la fideicomisaria María Lina Juliá, al llegar a su mayor edad, todos los beneficios acumulados hasta el 31 de diciembre de 1948. En enero de 1950, el fiduciario entregaría al beneficiario Luis Esteban

Juliá, al llegar a su mayor edad, todos los beneficios acumulados al 31 de diciembre de 1949. Cinco años después, en cada caso, el fiduciario entregaría todo el fideicomiso, incluyendo ganancias, a cada beneficiario. El fiduciario, en representación de los fideicomisos, prestó la suma de $70,000 a la contribuyente, a un interés del 5% anual. Como resultado de ese préstamo, la contribuyente pagó al fiduciario ciertas cantidades por concepto de intereses, durante los años 1946, 1947 y 1948, a saber, $2,673.60 en el año 1946; $3,500 en el año 1947 y $3,500 en el año 1948. La deducibilidad de esos intereses por la contribuyente es lo que está en controversia. Conviene indicar que durante los años 1946 al 1948 el Dr. Juliá y su esposa eran dueños de 106 de las 210 acciones emitidas por la contribuyente, esto, es, un 50.48% del total de acciones. El fiduciario de los fideicomisos ya mencionados era dueño de 101 acciones, quedando tres otras personas con una acción cada una, hasta completar las 210 acciones. El tribunal de San Juan resolvió que, al pagarse los intereses al fiduciario, los beneficiarios tenían derecho al 25% de esos pagos, recibiendo ellos un ingreso tributable en cuanto a tal 25%; que ese 25% constituyó también ingreso del Dr. Juliá y de su esposa en virtud del usufructo legal que ellos tenían sobre los ingresos de sus hijos menores de edad (*Cf. Hernández* v. *Tribunal de Contribuciones*, 73 D.P.R. 710), y que, en vista de que el Dr. Juliá y su esposa tenían más del 50% de las acciones de la corporación, tal 25% de los intereses que los padres tenían derecho a recibir no era deducible, en virtud de lo dispuesto por la sec. 32(a)(2) de nuestra Ley de Contribuciones sobre Ingresos, según enmendada por la Ley 107 de 12 de mayo de 1943 (pág. 303), al efecto de que no son deducibles los intereses pagaderos entre una corporación y un individuo cuando el individuo posee o controla directa o indirectamente, a través de su familia, más del cincuenta por ciento del valor de las acciones emitidas por la corporación, disponiendo además tal sección que un individuo debe ser considerado como dueño de las acciones que

pertenezcan directa o indirectamente a su familia. La contribuyente ha impugnado ante nos la decisión del tribunal a quo de no conceder una deducción en cuanto al 25% de esos intereses. El Secretario de Hacienda, en su apelación, alega que la totalidad de los intereses pagados debe ser rechazada como deducción, y no meramente un 25%.

Consideremos en primer término el planteamiento hecho por el Secretario de Hacienda, al efecto de que ninguna parte de los intereses pagados debe ser considerada como deducible. Su tesis es al efecto de que el capital del fideicomiso estaba controlado por los menores beneficiarios; que en virtud de su patria potestad sobre sus hijos, el Dr. Juliá y su esposa controlaban indirectamente el fideicomiso; que los intereses pagados por la corporación al fideicomiso eran por lo tanto intereses pagados indirectamente al Dr. Juliá y a su esposa y que, por lo tanto, en vista del control que tenían los esposos Juliá sobre la corporación, tales intereses no eran deducibles por haber sido pagados indirectamente a personas que poseían más del 50% de las acciones corporativas. Independientemente del hecho de que la estructura creada en la argumentación del Secretario de Hacienda puede envolver elementos demasiado remotos, indirectos y complejos para justificar el rechazo total de las deducciones, tal tesis no está sostenida por nuestra Ley de Contribuciones sobre Ingresos. Es útil considerar de nuevo, como puntal de referencia, la ley federal de Contribuciones sobre Ingresos. Bajo la sec. 301 de la ley federal de 1937, (patrón de nuestra ley del 1941), se enmendó la sec. 24(a) de la Ley de 1936 (Seidman, *Legislative History of Federal Income Tax Laws*, págs. 201, 198, 199) para disponer, en parte, que los intereses incurridos no serían deducibles (1) si no se pagaban dentro del año contributivo o dentro de los dos meses y medio posteriores y (2) si el acreedor seguía el método de *cobrado y pagado* y (3) si el contribuyente y el acreedor son personas entre las cuales no se permitirían deducciones por pérdidas bajo la sec. 24(b). La sección 24 determina, en parte, que no se

concederán deducciones por pérdidas en cuanto a ventas o permutas entre una corporación e individuo, o entre dos corporaciones, cuando medie la relación de control de la mayoría de las acciones; *entre el creador o fideicomitente de un fideicomiso (grantor) y el fiduciario;* entre el fiduciario de un fideicomiso y el fiduciario de otro fideicomiso si ambos han sido creados por el mismo fideicomitente y *entre un fiduciario de un fideicomiso y el beneficiario de ese fideicomiso.* Se sigue disponiendo que, a los fines de determinar la localización del dominio de las acciones, (*a*) las acciones bajo el dominio directo o indirecto de una corporación, sociedad, sucesión *o fideicomiso,* serán consideradas como si perteneciesen a los accionistas, socios *o beneficiarios;* (*b*) un individuo será considerado como dueño de las acciones que pertenezcan directa o indirectamente a su familia . . . . . (*e*) a los fines de convertir un dominio implícito o indirecto (*constructive ownership*) en un dominio actual, las acciones que pertenezcan implícitamente a una persona bajo la subdivisión (*a*) (al accionista o beneficiario de un fideicomiso por el hecho de pertenecer las acciones a la corporación o al fideicomiso) serán consideradas como pertenecientes actualmente a tal accionista o beneficiario, no siendo aplicable tal regla de identificación del dominio implícito con el actual a otras situaciones mencionadas en la sección 24. En virtud de esas disposiciones estatutarias, se ha indicado que, coordinando las distintas reglas sobre dominio implícito, las acciones que pertenezcan implícita o indirectamente a un individuo como accionista, socio *o beneficiario* de una corporación, sociedad *o fideicomiso,* se considerarán como pertenecientes actual y realmente a tal individuo, a los fines de colocar a una tercera persona distinta en la posición de dueño implícito. 5 Mertens 236, 237, sec. 28.49.

Es innecesario resolver si las disposiciones de la ley federal ya señaladas sostienen la tesis del demandado. Al enmendarse en el año 1941 (Ley núm. 31 de 12 de abril de 1941 ((1) pág. 479) nuestra ley básica de Contribuciones

sobre Ingresos, se adoptaron varias de las innovaciones contenidas en la ley federal de 1937. Pero en las secciones referentes a la deducción de intereses (sec. 16 (2) y 32 (a) (2), habiendo sido enmendado este último inciso de la sec. 32 (a) por la ley número 107 de 12 de mayo de 1943), no se incluye disposición alguna que prohiba la deducción de intereses cuando esté envuelto un fideicomiso ni se adopta disposición alguna que establezca el concepto del dominio implícito o indirecto (*constructive ownership*) en situaciones en que exista un fideicomiso. La sec. 32 (a) (2) (según fué enmendada por la Ley núm. 107 de 12 de mayo de 1943) dispone lo siguiente:

"(2) Todos los intereses pagados o acumulados dentro del año contributivo sobre sus deudas, excepto sobre deudas incurridas o continuadas para la compra o posesión de obligaciones o valores (que no sean obligaciones de los Estados Unidos emitidas después de septiembre 24 de 1917, y suscritas originalmente por el contribuyente), cuyo interés está totalmente exento de tributación a virtud de este título. *Disponiéndose,* que no son deducibles los intereses pagaderos entre un individuo y una corporación o sociedad, ni los intereses pagaderos entre una corporación o sociedad y un individuo, cuando el individuo posee o controla directa o indirectamente, o a través de su familia, más del cincuenta (50) por ciento del valor de las acciones emitidas (*outstanding stock*) por la corporación o más del cincuenta (50) por ciento del capital social, o entre dos corporaciones cuando una de ellas posea o controle más de un cincuenta (50) por ciento de las acciones emitidas (*outstanding stock*) por la otra corporación, o entre dos sociedades cuando una de ellas posea o controle más del cincuenta (50) por ciento del capital social de la otra, o entre una sociedad y una corporación cuando dicha corporación posea o controle más del cincuenta (50) por ciento del capital social de aquélla, o entre una corporación y una sociedad cuando dicha sociedad posea o controle más del cincuenta (50) por ciento de las acciones emitidas (*outstanding stock*) por dicha corporación. Para los fines de esta sección son aplicables las mismas definiciones de familia, corporación y sociedad contenidas en esta Ley."

El rechazo de la deducción por intereses se limita al caso de una relación de control de una corporación o sociedad, sin incluirse en tal prohibición los casos de fideicomisos, cuyos casos estaban cubiertos expresamente en la ley federal. Tampoco se incluyeron en nuestra ley las disposiciones expresas contenidas en la ley federal en cuanto al dominio implícito o indirecto por un beneficiario de un fideicomiso, y de una tercera persona a través del dominio implícito de un beneficiario. Por analogía, nuestra sec. 32 (*a*) (4), referente a la deducción por pérdidas, dispone que "para los fines de todos los apartados de esta sección, un individuo debe ser considerado como dueño de las acciones que pertenezcan directa o indirectamente a su familia, entendiéndose por 'familia', a los fines de esta sección, los parientes hasta el cuarto grado de consanguinidad o afinidad". Suponiendo la aplicabilidad de esta última disposición a las deducciones de intereses, es conveniente observar que tal disposición está incluída en la ley federal, pero esa ley contiene además otras categorías de dominio implícito, incluyendo los casos de fideicomisos, que no fueron incluídas en nuestra ley. La omisión de nuestro legislador de incluir los casos de fideicomisos en la prohibición de las deducciones en virtud del pago de intereses, y la omisión del concepto del dominio indirecto en cuanto a fideicomisos, constituyen una elocuente demostración del hecho de que no fué la intención legislativa el rechazar las deducciones por el pago de intereses por el hecho en sí de que los intereses sean pagados a un beneficiario o a un fiduciario de un fideicomiso. De todos modos, nuestro estatuto no incluye, en la prohibición de deducciones de intereses, el caso de fideicomisos. Al no ser incluídos en la prohibición, ellos deberían ser deducibles, ya que este Tribunal iría más allá de su función judicial al incluir en el rechazo de deducciones por intereses incurridos un caso que no ha sido incluído en la prohibición por el legislador. *Comunidad Sucn. Fajardo* v. *Tribunal de Contribuciones*, supra.

Es aplicable a este caso, por analogía, el de *Charles B. Bohn* v. *Commissioner of Internal Revenue*, 43 B.T.A. 953, 956. En ese caso el Comisionado de Rentas Internas alegaba que no era deducible una pérdida ocurrida en una venta de acciones verificada entre el creador o fideicomitente de un fideicomiso y el fiduciario. La venta ocurrió al amparo de la ley federal de Contribuciones o Rentas Internas del 1934, cuya sec. 24 (*a*) (6) disponía, en parte, lo siguiente:

"Al computar el ingreso neto no se permitirá deducción alguna con respecto a . . . (6) pérdidas que surjan de ventas o permutas de bienes, directa o indirectamente, (A) entre miembros de una familia. . . . . A los fines de este párrafo . . . . la familia de un individuo incluirá solamente a sus hermanos y hermanas, . . ... esposos, ascendientes y descendientes en línea recta."

La Junta de Apelaciones Contributivas dijo, en parte, lo siguiente:

"Se notará que el estatuto no menciona expresamente las ventas entre el fideicomitente (*settlor*) y el fiduciario de un fideicomiso. Nuestra investigación es al efecto de si la intención de cubrir una situación como la que está aquí en controversia surge de las palabras 'directa o indirectamente', y nosotros podemos, en vista de tal ambigüedad, o dudas en cuanto al significado, considerar la historia legislativa de la sección. *Caminetti* v. *United States*, 242 U. S. 470; *Penn. Mutual Life Ins. Co.* v. *Lederer*, 252 U. S. 523.

"Nosotros hemos resuelto que ésta disposición estatutaria es ambigua y que no es útil la historia legislativa de esa sección. *Shelden Land Co.*, 42 B.T.A. 498. En ese caso se indica meramente que el propósito general de la sección es el de no conceder pérdidas en ventas entre miembros de una familia, porque ventas de ese tipo han sido frecuentemente usadas para evadir el pago de contribuciones sobre ingresos. La luz se vierte sobre el problema, sin embargo, al considerar las disposiciones y la historia de la sec. 301 (*a*) de la Ley de Rentas Internas de 1937, que enmendó la sec. 24 (*a*) (6), añadiendo a ella una disposición que prohibe la deducción de pérdidas en ventas entre el fideicomitente y el fiduciario de un fideicomiso. . . . . .

". . . . Nos parece que la inferencia razonable a ser deducida de tal enmienda a la sección, y de tales declaraciones (del Comité Congresional), es al efecto que las transacciones del tipo aquí envuelto no estaban cubiertas por la ley del 1934. La venta aquí no era entre el padre y la hija, sino entre el padre y el fiduciario, en beneficio de la hija. La hija no podría obtener la plena posesión de las acciones hasta la terminación del fideicomiso, y aun así, su sucesión quedaría sin derechos de morir ella previamente. El creador del fideicomiso no retuvo poderes algunos sobre el fideicomiso, convirtiéndose por lo tanto en inaplicable el caso de *Helvering* v. *Clifford,* 309 U. S. 331. El resolver que la transacción cae dentro del ámbito de la sec. 24 (*a*) (6), equivaldría a leer algo en un estatuto ambiguo, que no está dentro del estatuto, en un esfuerzo por lograr una clarificación *ad hoc.* El Comisionado, citando a *Higgins* v. *Smith,* 308 U. S. 473, insiste en que la sec. 301 de la Ley del 1937 solamente clarificó y extendió la regla ya existente. Tal alegación queda, por supuesto, refutado por el informe del comité arriba citado, que indica que *nuevas* restricciones se están añadiendo a una ley *inadecuada.* Resolvemos que el peticionario tiene derecho a la deducción reclamada."

Alega el Secretario de Hacienda que los esposos Juliá controlaban tanto la corporación como los fideicomisos, y que estos últimos podían, por lo tanto, servir de instrumento para la evasión o reducción del pago de contribuciones, mediante la declaración corporativa de distribución de dividendos en beneficio de los fideicomisos. Existen algunas circunstancias bajo las cuales, a los fines de la contribución sobre ingresos, se ignora la existencia y personalidad jurídica de un fideicomiso y se considera al creador del fideicomiso, esto es, al fideicomitente, como dueño real de las propiedades y de los ingresos del fideicomiso, no obstante el fideicomiso. En el caso de *Helvering* v. *Clifford,* supra, un esposo constituyó un *trust* y se convirtió a sí mismo en fiduciario. El ingreso era pagadero a la esposa, pero el esposo se reservó el derecho de acumular los ingresos, y mantuvo el control casi total del *corpus,* en cuanto a su administración, inversión y reinversión, debiendo devolverse el *corpus* al esposo al finalizar el tér-

mino del fideicomiso. Se resolvió que, no obstante el fideicomiso, el esposo continuaba siendo el dueño de los ingresos del fideicomiso, que constituían ingreso tributable del esposo. Las circunstancias del caso citado no concurren en el caso de autos. Aquí los fideicomisos son irrevocables, y los esposos Juliá no se reservaron poder o control alguno sobre las propiedades del *trust* ni sobre su administración, inversión o reinversión. El *corpus* y los ingresos no revertían a ellos al terminar los fideicomisos, sino que más bien se entregarían a los beneficiarios. Es aplicable el caso de *Belaval* v. *Tribunal de Expropiaciones*, 71 D.P.R. 265, en que se consideró que, en un *trust*, el fiduciario, y no los beneficiarios, era el dueño de ingresos recibidos por el fideicomiso.

Al constituirse los fideicomisos se dispuso que un 25% del ingreso neto anual de los fideicomisos se entregaría anualmente a cada beneficiario. El tribunal a quo resolvió que, en virtud de tal disposición, no era deducible un 25% de los intereses pagados a los fideicomisos, ya que tal 25% era realmente pagado a los esposos Juliá en virtud de su usufructo legal sobre los ingresos de los menores, y ellos controlaban más del 50% de las acciones de la corporación que había pagado esos intereses. Incurrió en error el tribunal de San Juan, ya que no se demostró que esos intereses así pagados *a los fideicomisos* hubiesen sido pagados a los beneficiarios como parte de su ingreso neto, esto es, no se identificó el 25% de esos intereses como parte del ingreso *neto* anual *de los beneficiarios*. En otras palabras, no surge de los autos que el 25% de los intereses coincidiese con o fuese parte del 25% del ingreso neto anual de los fideicomisos. Los intereses eran parte del ingreso bruto de los fideicomisos, pero para poder demostrar que los padres habían recibido un 25% de tales intereses, en virtud de su usufructo legal sobre los ingresos de sus hijos, había que demostrar que los hijos habían recibido efectivamente ese 25%, como la cuarta parte del ingreso neto de los fideicomisos, o como parte del 25% del ingreso neto de los fideicomisos. Debe modificarse la senten-

cia apelada a los fines de que se reconozca la deducibilidad de la totalidad de los intereses en cuestión.

▮▮▮▮▮▮ Alega la contribuyente que está prescrita la contribución del año 1943 por haber transcurrido el término de siete años fijado en la sec. 60 (a) de la ley de Contribuciones sobre Ingresos sin que la contribuyente hubiese renunciado válidamente a alegar tal prescripción. En cuanto a este punto, el tribunal sentenciador dijo lo siguiente:

"La declaración de ingresos de la demandante para el año 1943 fué radicada el 15 de mayo de 1944. En 12 de septiembre de 1950 se notificó a la demandante deficiencias tentativas para el año 1943, solicitándose vista administrativa en octubre 9, 1950. El 13 de abril de 1951 el demandado comunicó a la demandante que a fin de evitar la tasación de la deficiencia notificada para el año 1943 en la forma en que dispone la sec. 57 (c) de la Ley, debería cumplimentarse y archivarse un documento de renuncia del período de prescripción. En uno de los días de dicho mes de abril la contribuyente firmó y archivó en el Departamento de Hacienda el documento renunciando a todos los efectos legales el período de prescripción de 7 años que dispone la sec. 60 (a) (1) de la Ley con respecto a su declaración de ingresos para el año contributivo terminado en 31 de diciembre de 1943, conviniéndose que cualquier deficiencia en la contribución que resultare en relación con la declaración de ingresos antes mencionada, podría ser tasada en cualquier fecha en o antes del 31 de mayo de 1952. En agosto 9 de 1951 el demandado notificó a la demandante deficiencias para los años de 1943 a 1948 con una nota al calce expresando que esta notificación dejaba sin efecto la servida el 12 de septiembre de 1950. La deficiencia definitiva fué notificada en septiembre 14, 1951.

"Habiéndose radicado la declaración de ingresos para el año 1943 el 15 de mayo de 1944, el período prescriptivo de 7 años vencía el 15 de mayo de 1951. Antes de su vencimiento la demandante renunció a dicha prescripción, pero a base de que la contribución no podría ser tasada después del. 31 de mayo de 1952. La deficiencia final fué notificada el 14 de septiembre de 1951, o sea, con anterioridad al 31 de mayo de 1952. Prima facie la situación es diáfana al efecto de que la contribución para el año 1943 no prescribió.

"La demandante sin embargo, argumenta que ella renunció al período prescriptivo sólo en relación con la deficiencia tentativa notificada el 12 de septiembre de 1950, y no en relación con la deficiencia notificada el 9 de agosto de 1951, y que como por disposición del demandado esta notificación de 9 de agosto de 1951, no existía renuncia de prescripción en vigor cuando se notificó la deficiencia final.

"No podemos darle la razón a la demandante. Según el texto del documento que ella firmó, ella renunció el período de prescripción con respecto a su declaración de ingresos para el año de 1943, y no en relación con tal o cual notificación de deficiencias tentativas. En el proceso para la fijación de la contribución sobre ingresos que por ley un contribuyente debe pagar para determinado año, puede haber una o varias notificaciones interlocutorias de deficiencias, hasta que se llegue a una notificación con carácter de final. Pero la contribución que en definitiva se determina y se tasa no es en relación con determinada notificación tentativa, y sí en relación con el año contributivo envuelto. Ya hemos dicho que la contribuyente renunció expresamente el período prescriptivo en relación con su año contributivo de 1943. Debemos por lo tanto concluir que no procede la defensa especial de prescripción interpuesta por ella para dicho año."

La declaración de ingresos de la demandante para el año contributivo de 1943 fué radicada el 15 de mayo de 1944. Bajo la sec. 60(a) de la ley de Contribuciones sobre Ingresos el término prescriptivo para notificar y tasar la contribución vencía, en este caso, el 15 de mayo de 1951. La sec. 61(b), sin embargo, dispone que: "Cuando ambos, el Tesorero y el contribuyente, hubieren acordado por escrito imponer la contribución después de transcurrido el período fijado por la sec. 60 para la imposición de la misma, ésta podrá ser impuesta en cualquier momento antes del vencimiento del período acordado."

La renuncia por el acuerdo a que hace referencia la sec. 61(b) debe regirse, en cuanto a su extensión y consecuencias legales, por los propios términos del convenio. *Buscaglia* v. *Tribunal de Contribuciones*, 67 D.P.R. 693. En este caso el convenio dispone, en parte, que la contribuyente "renuncia, *a*

*todos los efectos legales*, el período de prescripción de siete años que dispone la sec. 60 (*a*) (1) de la ley, *con respecto a su declaración de ingresos* por el año contributivo terminado en 31 de diciembre de 1943, conviniéndose que *cualquier deficiencia* en contribución sobre ingresos *que resultare* bajo la ley vigente, *con relación a la declaración de ingresos* antes citada, podrá ser tasada en cualquier fecha en o antes del 31 de mayo de 1953 (sic)." (Bastardillas nuestras.)

El convenio está redactado en términos absolutos, haciendo la renuncia aplicable a cualquier deficiencia que resultare con relación a la totalidad de la contribución que pudiere ser adeudada en cuanto al año 1943. La renuncia no quedaba limitada a las deficiencias ya notificadas, sino que era aplicable, de acuerdo con sus términos, a cualquier deficiencia adicional o posterior que fuese notificada, esto es, que resultare de la declaración de ingresos. Actuó correctamente el tribunal a quo al resolver que la contribución para el año 1943 no estaba prescrita.

En el caso de *Emily Marx* v. *Commissioner*, 13 T. C. 1099, 1105, la renuncia a la prescripción disponía que el período de tiempo para la tasación se extendía a todos los fines (*for all purposes*). Se resolvió que una adición posterior a la contribución impuesta, en virtud del rechazo de un crédito, era parte de la contribución y estaba cubierta por el convenio de renuncia.

*Debe modificarse la sentencia apelada a los fines de permitir como deducciones la totalidad de los intereses pagados por la contribuyente a los fideicomisos ya mencionados, y, así modificada, debe confirmarse la sentencia apelada.*

El Juez Asociado Sr. Sifre no intervino.

---

EN RECONSIDERACIÓN
23 de junio de 1954

Opinión del Tribunal emitida por el Juez Asociado Sr. Ortiz.

La contribuyente solicita de este Tribunal que reconsidere su dictamen en cuanto a la razonabilidad de los salarios pa-

gados al Dr. Mario Juliá, como Director Médico de la entidad contribuyente, en los años 1947 y 1948, a los fines de su deducibilidad por la contribuyente. Ratificamos lo expuesto generalmente en nuestra opinión original en cuanto a los factores relevantes que deben ser considerados a los fines de formular una decisión en cuanto a la razonabilidad de salarios, como base para su deducibilidad. Pero después de examinar de nuevo la cuestión planteada, hemos llegado a la conclusión de que la contribuyente está en lo cierto al alegar que los salarios pagados al Dr. Juliá fueron enteramente razonables. En nuestra opinión original no le dimos importancia adecuada a dos factores que realmente son determinantes en este caso. Nos referimos a la compensación pagada a los otros médicos que trabajan en la Clínica Juliá, en comparación con el salario pagado al Director Médico de la institución, y nos referimos además a la realidad de la inflación en el nivel de vida que se ha manifestado en Puerto Rico.

De los autos surge que cuatro médicos que trabajaban en la Clínica Juliá durante los años en controversia ganaron $29,500 cada uno en el año 1947 y $23,999 cada uno en el año 1948. Considerando aisladamente el valor de los servicios del Dr. Juliá, como Director Médico, y considerándolo además en comparación con el valor de los servicios de los otros médicos que estaban bajo su supervisión, es completamente razonable el salario de $32,000 señalado para los años en cuestión, teniendo en cuenta el valor del dólar durante esos años.

Se hace preciso el discutir dos aspectos peculiares de este caso, esto es, que el Dr. Juliá controla más del 50% de las acciones de la entidad contribuyente y que la compensación a los otros cuatro médicos se fijó de acuerdo con la fórmula al efecto de que cada uno de los cuatro médicos recibiría una cuarta parte del 45% de los ingresos netos de la contribuyente. No puede aceptarse como absoluto y rígidamente aplicable a todos los casos el postulado de que el salario del director sea razonable por el hecho en sí de que sea superior

al de sus subordinados. La compensación recibida por los empleados podría ser excesiva, y ello podría implicar que el salario superior del director podría ser tan irrazonablemente alto que representase ser una distribución de beneficios y no el pago de un salario razonable, en una situación en que el director controle la mayoría de las acciones. Pero en el caso específico de autos no se ha impugnado la razonabilidad de los salarios pagados a los cuatro médicos y, como cuestión de hecho, esos salarios y el salario de $32,000 pagado al Dr. Juliá eran enteramente razonables. No surge de los autos que en este caso se hayan adjudicado o manipulado artificialmente los salarios para que una distribución de beneficios se ocultase a través del disfraz del pago de salarios. Lo que ocurrió, sencillamente, fué que al Director Médico de la institución se le pagó un salario superior al de los otros cuatro médicos, y tanto el salario de estos últimos como la compensación pagada al Dr. Juliá eran razonables.

*Debe reconsiderarse y modificarse nuestra sentencia anterior al efecto de que se modifique la sentencia del tribunal de primera instancia a los fines de permitir como deducciones los salarios de $32,000 pagados al Dr. Mario Juliá en cada uno de los años 1947y 1948.*

El Juez Asociado Sr. Belaval concurre con el resultado.

El Juez Asociado Sr. Pérez Pimentel disintió.

El Juez Asociado Sr. Sifre no intervino.

---

### EN MOCIÓN DE RECONSIDERACIÓN
3 de agosto de 1954

El 23 de junio de 1954 reconsideramos nuestra opinión original, a petición de la contribuyente, y resolvimos que los salarios de $32,000 anuales pagados al Dr. Juliá eran razonables. Posteriormente, el Secretario de Hacienda presentó una moción de reconsideración en que alega que (1) incurri-

mos en error al reconsiderar nuestro dictamen original en cuanto a la razonabilidad de los sueldos pagados al Dr. Juliá y que (2) debemos reconsiderar aquella parte de nuestra opinión original en que resolvimos que era deducible el 25% de los intereses pagados por la contribuyente a los fideicomisos establecidos por el Dr. Juliá en beneficio de sus hijos.

Después de un nuevo estudio de la cuestión planteada en cuanto a la razonabilidad de los sueldos pagados al Dr. Juliá, ratificamos nuestro criterio, expresado en nuestra opinión anterior en reconsideración, al efecto de que fueron razonables los sueldos de $32,000 recibidos por el Dr. Juliá. En cuanto a la deducibilidad del 25% de los intereses a que hemos hecho referencia, habíamos indicado, en nuestra opinión original, que tales intereses eran deducibles porque no se había establecido ni probado que el 25% de tales intereses hubiese estado incluído en el 25% del ingreso neto de los fideicomisos, a que tenían derecho los hijos del Dr. Juliá, beneficiarios de los fideicomisos, y que, por lo tanto, tales intereses no habían sido recibidos implícitamente por el Dr. Juliá. Alega el Secretario de Hacienda que tal cuestión no se planteó ante el tribunal a quo, ni se presentó prueba sobre tal extremo, debiendo devolverse el caso al tribunal de San Juan para que allí se dilucide esa cuestión en primera instancia y que, de todos modos, el peso de la prueba debe recaer sobre la contribuyente para probar que el 25% de los intereses pagados no estaba incluído en el 25% de los ingresos netos de los fideicomisos.

Es innecesario el considerar tales alegaciones del Secretario de Hacienda, ya que, desde otro punto de vista distinto al que expresamos en nuestra opinión original, el resultado debe ser el mismo, esto es, debe ser deducible el 25% de los intereses pagados a los fideicomisos. La sec. 32(a)(2) de la Ley de Contribuciones sobre Ingresos (según fué enmendada por la Ley núm. 107 de 12 de mayo de 1943) dispone, en parte, que son deducibles los intereses pagados (por una corporación) sobre sus deudas, pero que no son deducibles los

intereses pagaderos (o pagados, Cf. *Buscaglia, Tes.* v. *Tribl. de Contribuciones, Rullán, Interventor,* 67 D.P.R. 585) entre un individuo o una corporación, o vice-versa, cuando el individuo posee o controla más del 50% del valor de las acciones emitidas por la corporación o entre dos corporaciones cuando una de ellas posea o controle más de un 50% de las acciones emitidas por la otra corporación. Fué el propósito del legislador, entre otros, el de cubrir el caso de deudas de una corporación a un individuo que controlase la mayoría de las acciones corporativas. En este caso la deuda de la corporación no era al Dr. Juliá, ni a su esposa. Las obligaciones se habían incurrido en beneficio de unos fideicomisos. Tal como indicamos en nuestra opinión original, en forma contraria a la ley federal, que incluye expresamente a los fideicomisos en las categorías en que no se permite la deducibilidad de intereses, cuando medie la relación de control, en nuestra ley no se incluyen los fideicomisos, esto es, no se dispone que, de haber deudas a un fideicomiso, no serían deducibles los intereses, si existe la relación de control directo o indirecto. Los intereses pagaderos a fideicomisos caen bajo la norma general de deducibilidad de intereses establecida en la sec. 32(a)(2), al no estar consignados en las excepciones enumeradas en esa sección.

Podría alegarse que los fideicomisos pueden servir de método de evasión de contribuciones y de vehículo de deducciones artificiales. Sin embargo, el legislador no ha decidido cerrar esa posible avenida de escape en la sec. 32(a)(2). También podría adelantarse un argumento al efecto de que, prescindiendo de toda discusión relativa a fideicomisos, como cuestión de realidad, los intereses, en este caso, se pagaron a los hijos menores de edad del Dr. Juliá y su esposa y que, por lo tanto, eran ingresos de los cónyuges, en virtud de su usufructo legal sobre el ingreso de sus hijos. Pero el problema ante nos es uno de intereses deducibles por la corporación, y no de ingresos tributables del Dr. Juliá y de su esposa. El hecho de que estos últimos recibieran tales ingresos no excluye

la realidad de que no mediaba deuda alguna entre la corporación y los esposos Juliá.

*Debe declararse sin lugar la moción de reconsideración del Secretario de Hacienda.*

El Juez Asociado Sr. Pérez Pimentel concurre con el resultado.

El Juez Asociado Sr. Sifre no intervino.